IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |  |
|---|---|---|---|
| JASTI RAO, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | 14 C 66 | |
| | ) | | |
| CHRISTOPHER GONDI et al., | ) | Judge Virginia M. Kendall | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |
| | ) | | |
| | ) | | |

## **MEMORANDUM OPINION AND ORDER**

Before his resignation in March of 2013, Plaintiff Dr. Jasti Rao was a high-profile cancer researcher at the University of Illinois's College of Medicine at Peoria, a tenured professor at the University, and one of its highest paid employees.  On March 21, 2013, that all changed when Dr. Rao resigned his positions after being presented with evidence of misconduct by the University's outside counsel, including allegations that he demanded and accepted cash payments from at least one subordinate to pay off alleged gambling debts and concealed the extent of errors in papers published by his lab and then directed subordinates to delete documents evidencing the scope of the errors.  Following his resignation, Dr. Rao sued the University, along with his former supervisors, Dr. Sara Rusch and Dr. Dimitri Azar.  In his surviving claims, [1] Dr. Rao alleges that he was discriminated against on the basis of his national origin in violation of Title VII and the Illinois Civil Rights Act of 2003 ("ICRA") (Counts I, II, and VII), retaliated

---

[1] Dr. Rao's Section 1983 claims against the University were dismissed on January 11, 2017.  (*See* Dkt. 253.)

against for raising allegations of research improprieties against other professors (Count VII), and denied due process and equal protection (Counts IX and X).

After a long and contentious discovery process, both parties filed summary judgment motions. Defendants moved for summary judgment on all counts; while Dr. Rao moved for summary judgment only on his Due Process Section 1983 claim against Dr. Rusch and Dr. Azar (Count IX). For the reasons stated herein, Defendants' Motion for Summary Judgment is granted in part and denied in part, and Dr. Rao's Motion for Summary Judgment is denied.

## BACKGROUND

In this district, Local Rule 56.1 governs the procedures for parties moving for and responding to summary judgment. Along with a memorandum in support and relevant evidence required by Rule 56(e), Local Rule 56.1 requires the moving party to include a statement of material facts as to which they contend there is no genuine issue and that entitle them to judgment as a matter of law. L.R. 56.1(a)(3) The party opposing the motion must respond to the movant's Local Rule 56.1 statement with a concise response to the movant's statement, containing a response to each numbered paragraph in the moving party's statements and separately, a concise statement of additional facts that require denial of summary judgment. L.R. 56.1(b)(3).

Rule 56.1 "serves an important function by ensuring that the proposed findings of fact are in a form that permits the district court to analyze the admissible evidence supporting particular factual propositions and determine precisely what facts, if any, are material and disputed." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir.2010). When reviewing Rule 56.1 statements, the court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chic. Sch. Reform Bd. of Trs.*, 233

F.3d 524, 529 (7th Cir. 2000). District courts are entitled to require strict compliance with Local Rule 56.1. *See Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016) (collecting cases). "[A] court does not abuse its discretion when it opts to disregard facts presented in a manner that does follow the Rule's instructions." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

Defendants moved to strike Dr. Rao's Rule 56.1 Statement of Additional Facts and his Responses to Defendants' Rule 56.1 Statement of Material Facts because they included: (1) legal conclusions or argument;[2] (2) were predicated on hearsay or lacked foundation;[3] (3) relied on unauthenticated documents or inadmissible evidence;[4] or (4) were not support by the cited evidence.[5] The Court routinely takes these motions to strike under advisement with the motions for summary judgment as they are disfavored in this district and rarely say more than the equivalent of "follow the rule." This time, however, the Court agreed with Defendants because of the wide variety of flagrant violations of Local Rule 56.1. Rather than merely striking the statement, as the Court could have done, however, the Court permitted the Plaintiff an opportunity to revise his Statement of Additional Facts.[6] (*See* Dkt. 285.) Dr. Rao did so on April 28, 2017, but this statement failed to cure many of the defects that plagued his original Local Rule 56.1 Statement of Additional Facts. As a result, as set forth below, the Court disregarded many of his statements and responses that failed to comply with Local Rule 56.1.

---

[2] Pl. SOAF ¶¶ 2-3, 5-7, 9-24, 26-29, 32, 34-38, 40-44 and 45.

[3] Pl. SOAF ¶¶ 7, 18, 24, 33, 35, 38, 42 and 44.

[4] Pl. SOAF ¶¶ 1, 4-6, 8-13, 15-19, 22-26, 29-30, 32, 35-39 and 41; Pl. Response to Defs' SOF ¶¶ 24, 27-31, 35-36, 39-44, 47-48 and 61.

[5] Pl. Response to Defs' SOF ¶¶ 20-28, 30-32, 35-44, 47-52, 59, 61, 77-78 and 79; Pl. SOAF ¶¶ 1-45.

[6] Dr. Rao's Reply to the Defendants' Local Rule 56.1(b)(3)(B) Response will also be disregarded, as it fails to comply with Rule 56.1 and Rao did not seek leave of Court to file the document. Courts within this district have repeatedly stricken such replies. *See Pulliam v. City of Chi.*, No. 08 C 7318, 2010 WL 3238837, at *4 n. 2 (N.D. Ill. Aug.12, 2010); *Cent. States, Se. & Sw. Areas Pension Fund v. Sara Lee Bakery Grp.*, 660 F.Supp.2d 900, 908–09 (N.D. Ill. 2009).

Without leave of court, Local Rule 56.1 limits parties responding to summary judgment to the use of 40 statements of additional fact. L.R. 56.1(b)(3)(C). Dr. Rao originally sought and was granted leave to submit five additional facts. (*See* Dkt. 256.) Even with permission to file additional facts, the majority of his statements of additional fact included multiple assertions of fact, with some statements comprising more than 10 assertions of fact. Although his revised statement includes less facts than his original stricken statement, Plaintiff's revised statement of *additional* facts includes over 150 facts in 45 paragraphs--almost quadruple the amount of facts permitted by rule. L.R. 56.1(b)(3). Indeed, each statement should be limited to only one or two factual propositions. *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("The numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response.") (quoting *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000)). All but two of Plaintiff's revised statements include more than one factual proposition and a significant number contain four or more factual assertions. (*See, e.g.*, Dkt. 286 ¶¶ 12, 15, 17-18, 22, 24, 27, 30-32, 34-35, 37-38, 40-42, 44-45.) In spite of being given an opportunity to correct the previous filing and in spite of this Court's warning, Plaintiff continued to file multiple fact statements within each individual statement. The Court, therefore, disregarded any fact after the fourth statement – more leniency than Plaintiff deserved under the circumstances.

Several of Dr. Rao's statement of additional facts and responses to Defendants' Local Rule 56.1 statement also include legal and factual argument that must be disregarded. *See Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 359 (7th Cir.2009) (holding that where "much of [the party's] factual submission was argumentative" it was appropriate to strike it); *Judson Atkinson Candies v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 381 n. 2 (7th Cir.2008) ("It is

inappropriate to make legal arguments in a Rule 56.1 statement of facts."). Legal arguments are the province of the supporting memorandum of law provided for by Rule 56.1(b)(2).

Defendants also object to a number of Dr. Rao's Statement of Additional Facts because the evidence cited in support includes unauthenticated documents. Rule 56(c)(2) permits a party to object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," but Defendants do not assert that these exhibits cannot be authenticated, only that they were not authenticated. Many of the challenged documents were produced by Defendants or their agents during discovery and are likely to be authenticated at trial. As a result, for the purposes of summary judgment, Defendants' objections relating to unauthenticated documents are overruled because "federal courts routinely consider unauthenticated documents on motions for summary judgment, for example, when it is apparent [ ] that such documents are capable of reduction to admissible, authenticated form." *Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at *3 (N.D. Ill. Apr. 24, 2017); *see also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (noting that summary judgment materials may "be inadmissible at trial so long as *facts* therein could later be presented in an admissible form.") (citing Fed. R. Civ. P. 56(c)(2)-(4)).

The Court, however, disregarded all factual assertions that lack proper foundation or where the cited material failed to support the purported assertion of fact. *See Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir.2000) ("[C]onclusory statements, indications of opinion, or speculation [ ] do not produce a genuine issue for trial under Rule 56(c)."); *Curry v. City of Chic.* No. 10 CV 8241, 2013 WL 1283477, at *8 (N.D. Ill. Mar. 25, 2013) (striking supplemental exhibits for failure to comply with Local Rule 56.1, lack of foundation, and hearsay); *see also*

*Smith v. Allstate Ins. Corp.*, No. 99 C 0906, 2002 WL 485374, at *4 (N.D. Ill. Mar. 29, 2002) (striking portions of plaintiff's affidavit that provide no foundation for her statements).

A number of Dr. Rao's responses to Defendants' Statement of Facts and Statement of Additional Facts and responses to Defendants' Additional Statement of Fact assert facts that do not respond to Defendants' various factual assertions. To the extent that the non-movant wishes to assert facts that go beyond the scope of responding to the movant's facts, he must do so in his statement of additional facts and it is appropriate to disregard such extraneous material. *See* L.R. 56.1(b)(3)(C). *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (finding that district court did not abuse its discretion in striking responses that added "other additional facts")*; Johnson v. Cnty. of Cook,* 2012 WL 2905485, at *12 (N.D. Ill. July 16, 2012) ("It is inappropriate for a non-movant to include additional facts, meaning facts extraneous to the substance of the paragraph to which the non-movant is responding, in a Local Rule 56.1(b)(3)(B) response. Rather, Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement under Local Rule 56.1(b)(3)(C) of any additional facts that require the denial of summary judgment.") (citations and internal quotation marks omitted). As a result, the Court disregarded those extraneous assertions of fact and only considered facts in those responses that were relevant to establishing a dispute.[7] *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (Local Rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" do not comply with the Local Rules); *Levin v. Grecian*, 974 F. Supp. 2d 1114, 1117–18 (N.D. Ill. 2013) (ignoring "extraneous matter" in Plaintiff's Local Rule 56.1(b)(3)(B) responses, but taking into account "facts included in those responses that are relevant to showing that [] Local Rule 56.1(a)(3)

---

[7] *See, e.g.*, Pls. Response to Defs' SOF ¶¶ 19, 22, 23-32, 35-36, 38-44, 46-49, 51-52, 54, 59-61, 69, 77, 79 and 80.

assertions are genuinely disputed"). Consistent with the foregoing, the Court reviewed each Local Rule statement carefully and disregarded any intertwined argument, conclusion or unsupported fact.

The following facts, therefore, are the ones drawn from the supported and uncontested aspects of both parties' Statements of Facts and Statement of Additional Facts after this painstaking process has been applied and are undisputed unless otherwise noted.

**Factual Background**

Dr. Jasti Rao, is an Indian-born cancer researcher who was employed by the University of Illinois College of Medicine at Peoria from January 2001 until his resignation in March 2013. (Def. SOF ¶ 1; Pl. SOF ¶ 1.) Dr. Rao describes himself as an internationally renowned cancer researcher. The University originally hired Dr. Rao as a visiting professor in 2001 and then in 2002 or 2003, he became the program director for the University's Cancer Research Center, an appointed position, and a tenured professor. (Def. SOF ¶¶ 7-8; Pl. SOF ¶ 1.) In addition to being the Director of the Cancer Research Center, Dr. Rao held two other appointed, non-tenured positions: the head of the Department of Biomedical and Therapeutic Sciences, which became the Department of Cancer Biology and Pharmacology in 2006, (Def. SOF ¶¶ 7-9) and Senior Associate Dean of Research to which he was appointed in 2008. (Def. SOF ¶ 9; Pl. SOF ¶ 5.) These positions were appointed annually and Dr. Rao held these positions for the remainder of his employment with the University. (Def. SOF ¶¶ 7, 9; Pl. SOF 2.) At the time of his resignation, Dr. Rao was one of the University's five highest-paid employees, along with Dr. Dimitri Azar, Dean of the University's College of Medicine, Dr. Joe Garcia, Vice President of Health Affairs for University, and the head coaches of the University's football and men's basketball teams. (Pl. SOF ¶ 3.)

Following his appointment to Senior Associate Dean in 2008, Dr. Rao reported to Dr. Sara Rusch, the Regional Dean for the Peoria campus of the University's College of Medicine, who evaluated Dr. Rao's performance from 2008-2012. (Def. SOF 3, 12; Pl. SOF ¶ 5.) Each year Dr. Rusch evaluated Dr. Rao's performance, she rated his performance as outstanding, and in 2012 she nominated Dr. Rao for two awards, including the Peorian of the Year Award, which he received. (Def. SOF ¶ ¶12, 13; Pl. SOF ¶ 3.) Dr. Rusch also approved Dr. Rao's salary, including for the last academic year of his employment. (Def. SOF ¶ 13.) From 2011 or 2012 onward, Dr. Rusch reported to Dr. Dimitri Azar, the Dean of the University of Illinois College of Medicine at Chicago, who had a very positive view of Plaintiff and his performance prior to August 2012. (Def. SOF ¶ 4, 12; Pl, SOF ¶ 6.)

As part of his job duties, Dr. Rao was responsible for a research lab, which included supervising ten to fifteen employees, and for the policies, procedures, and results of the lab. (Def. SOF ¶ 10; Def. SOAF ¶ 12.) Dr. Rao was aware that he was responsible for being familiar with and complying with the University's policies and procedures, including its equal employment opportunity policy. (Def. SOF ¶ 11.) As a University employee, Rao was required to take annual ethics tests that included questions relating to the University's equal employment opportunity policy. (Def. SOF ¶ 11.) All but one of the lab's employees was of Indian national origin. (Def. SOF ¶ 10.)

On May 21, 2012, Dr. Rao became aware of an error in a paper that he had published with other scientists. (Def. SOF ¶ 14.) The first author of the paper, Dr. Sravan Vanamala, informed Dr. Rao through his staff that the error was a result of uploading the paper. (Def. SOF ¶ 14.) Dr. Rao corrected the error through a corrigenda, which according to Dr. Rao, was the first time in more than 30 years of academic publishing that he corrected a publication. (Def.

SOF ¶ 15.)  On July 11, 2012, Dr. Rusch met with Dr. Rao after receiving an anonymous letter accusing Dr. Rao of a variety of malfeasance, including research misconduct and allegations that he accepted cash payments from his employees.  (Def. SOF ¶ 16.)  Dr. Rao denied any wrongdoing, including disclaiming the allegation that he took money from his staff.  (Def. SOF ¶ 17.)  Dr. Rao, did however, accept responsibility for any errors in publications published by his lab as both an author and department chair.  (Def. SOF ¶ 17.)

As a result of the allegations, Dr. Rusch told Dr. Rao that she was going to inform Dr. Azar of the allegations and form an internal committee, which she called a "Dean's Committee," to review the research-related allegations against Dr. Rao.  (Def. SOF ¶ 18.)  Dr. Rao informed Dr. Rusch he would cooperate fully in the investigation.  (Def. SOF ¶ 18.)  After Dr. Azar became aware of the allegations, he recommended that Dr. Rusch forward her concerns to an appropriate body for further investigation.  (Pl. SOAF ¶ 41.)  Prior to these anonymous allegations against Dr. Rao, according to the University's outside counsel, no complaints had been submitted to the University regarding Dr. Rao's management of the lab.  (Pl. SOF ¶ 71.)

Dr. Rusch formed a Dean's Committee, using her sole discretion to select Dr. Pedro de Alarcon, Dr. Thomas Santoro, and Dr. James Graumlich, all of whom are professors at the University's College of Medicine in Peoria, to investigate the research-related allegations against Dr. Rao. (Def. SOF ¶ 19.)  Dr. Rusch testified that she formed the Dean's Committee because she was concerned that the allegations could have serious repercussions on Dr. Rao's career and she needed advice as to whether the allegations should be forwarded on for a full research integrity evaluation.  (Def. SOF ¶ 20.)  Dr. Rao disputes that this was the true purpose of the Dean's Committee and points out that a Dean's Committee is not defined in any University document.  (Dkt. 261 at ¶¶ 30-31; Pl. ¶ SOAF 27.)  On July 18, 2012, Dr. Rusch provided the

Dean's Committee with a written charge as to expectations regarding their review of the research-related allegations against Dr. Rao (Def. SOF ¶ 21.) Dr. de Alarcon provided Dr. Rusch with a preliminary report on August 2, 2012, before the other members had reviewed or commented on the draft report. (Pl. SOAF ¶ 27.) Dr. Rusch was not aware that the Dean's Committee members had not reviewed the preliminary report and she showed Dr. Azar the draft report. (Pl. SOAF ¶ 27.) On August 7, 2012, the Dean's Committee issued a final report to Dr. Rusch, which she forwarded to Dr. Azar. (Def. SOF ¶ 22.) The final report found "several issues with two manuscripts" published by Dr. Rao's lab in addition to "an atmosphere of pressure and tension that may have contributed to the misrepresentation of data." (Def. SOF ¶ 22.)

The Dean's Committee also found that there were several accusations beyond the scope and mandate of their charge that should be further investigated, including allegations that lab employees gave Dr. Rao cash payments to keep their jobs and immigration status, were forced to work seven days a week, and were asked to perform personal chores for Dr. Rao, including cooking, gardening, and serving tables. (Def. SOF ¶ 22.) The report concluded that the Committee members could not be impartial due to the importance of Dr. Rao's lab to the College of Medicine, where they all worked, and recommended that an "impartial group" should evaluate and investigate the remainder of the "very serious" complaints. (Def. SOF ¶ 22.) In turn, Dr. Azar contacted the Provost's office regarding the allegations against Dr. Rao. (Def. SOF ¶ 23.) Drs. Rusch and Azar sent the research integrity allegations to Dr. Mark Grabiner, the University's Research Integrity Officer, and sent the ethics-related allegations to Donna McNeely, the University's Ethics Officer.. (Def. SOF ¶ 23; Pl. SOF 32.)

**Dr. Rao's Allegations Regarding Dr. Azar, Dr. Garcia and Dr. Prabhakar**

In late July or early August 2012, Dr. Rao complained to Dr. Rusch that Drs. Azar, Garcia and Prabhakar each had errors in some of their publications. (Def. SOF ¶ 80; Dkt. 222-6 at 115:22-116:12; Dkt. 222-3 at 232:23-233:1.) None of these doctors worked on the University's Peoria campus or reported to Dr. Rusch. In fact, Drs. Azar and Garcia were considered Dr. Rusch's superiors. (Def. SOF ¶ 81.) Like Dr. Rusch, Dr. Prabhakar, who was Indian, also reported to Dr. Azar. (Def. SOF ¶ 81.) Dr. Rao asserts that Dr. Azar and Garcia are not of Indian origin. (Pl. Ex. C ¶ 9.) Dr. Rao did not initially report these errors to the Research Integrity Officer. (Def. SOF ¶ 80.)

Dr. Azar recalled that he became aware of Dr. Rao's allegations against him in the summer of 2012 after Dr. Rusch told him about them. Dr. Rusch, however, had no recollection of informing Dr. Azar of the allegations against him. (Pl. SOAF ¶ 40.) Dr. Grabiner testified at deposition that if he would have known about Dr. Rao's allegations against Dr. Azar, he would have concluded that Dr. Azar should not be a part of the review process; but the record does not support that Dr. Azar knew of Dr. Rao's allegations against him before the review process was completed nor that Grabiner was aware of Rao's allegations against Azar. (Pl. SOAF ¶ 40.)

In June 2013, several months after his employment with the University ended, Dr. Grabiner sent Dr. Rao a letter informing him that separate inquiries were opened into the allegations he brought against Drs. Azar, Garcia and Prabhakar, and that each Inquiry Team recommended that a formal investigation was not warranted. (Def. SOF ¶ 82; Dkt. 222-4.) Specifically, regarding the errors that Dr. Rao had alleged against Dr. Azar, of the three papers alleged to have errors, Grabiner determined that only one warranted going to the Inquiry stage. (Pl. SOAF ¶ 35.) Dr. Azar responded to the allegations by providing information to the Inquiry

Panel. (Pl. SOAF ¶ 35.) The Inquiry Team concluded that Dr. Azar had inserted an incorrect image into a paper but concluded that there was no evidence of a deliberate intention to deceive. (Pl. Ex. O; Pl. SOAF ¶ 11.) The Inquiry Team examining Dr. Rao's allegations against Dr. Garcia similarly found that the paper included an inadvertent error "that was very likely an honest" mistake and another "honest" typographical error. (Pl. Ex. Q; Pl. SOAF ¶¶ 11, 13.)

### The Ethics Investigation into Dr. Rao

On September 4, 2012, Dr. Rusch and Dr. Azar met with McNeely, the University Ethics Officer, and others to define a plan of action regarding the allegations against Dr. Rao. (Dkt. 227-6 at 207:9-20.) Before engaging external counsel in late September 2012, McNeely interviewed three individuals: Dr. Rao, Peggy Mankin, and Dr. Christopher Gondi. (Def. SOF ¶ 24; Pl. SOAF ¶ 39.) Following the initial set of interviews, McNeely chose not to interview anyone else due to her concerns regarding the nature of the allegations against Dr. Rao and her concern that additional expertise and time were required to perform the investigation. (Def. SOF ¶ 24, Dkt 222-9 at 47:17-48:4.) At that point, she initiated discussions with internal counsel regarding engaging external counsel to take over the investigation. (*Id.*) Before external counsel was engaged, McNeely also contacted the University's audit department for any prior audits of Dr. Rao's lab and reviewed financial information related to relevant grants. (Def. SOF ¶ 24.)

In late September 2012, the University retained Kaye Scholer, and two of their white collar crime attorneys, Zaldwaynaka Scott and Eric Sussman, to evaluate the evidence and make a determination as to whether any of the allegations against Dr. Rao were significant and corroborated. (Def. SOF ¶¶ 25-26; Pl. SOF ¶¶ 9-11.) Kaye Scholer's investigation evaluated the list of twelve allegations lodged against Dr. Rao and concluded that ten of those allegations were not supported by sufficient evidence. (Def. SOF ¶ 27; Pl. SOF ¶ 13.) Kaye Scholer believed that

two allegations were significant and supported by evidence and provided the University with relevant information regarding their conclusions. (Def. SOF ¶ 27.)

Kaye Scholer concluded that Dr. Rao required at least one employee, Dr. Gondi, to pay Dr. Rao back over $15,000 of his salary between July 16, 2010 and June 2012, which was funded in part by federal grants. (Def. SOF ¶¶ 28-29.) This conclusion was supported by Dr. Gondi's statements, video footage secretly taken by Dr. Gondi in July 2010 showing Dr. Gondi providing money to Dr. Rao, and Dr. Gondi's bank records (Def. SOF ¶ 28.) In interviews with Kaye Scholer during their investigation, Dr. Rao denied ever loaning or otherwise receiving money from anyone working for him. (Def. SOF ¶ 29.) Kaye Scholer concluded that Dr. Rao had a need for cash without his wife's knowledge due to a gambling problem. (Def. SOF ¶ 30.) As a result, Kaye Scholer determined that Dr. Rao needed to obtain large sums of money from India to the United States without his wife's knowledge, supporting Dr. Gondi's claim that Dr. Rao asked him to transport large sums of cash in violation of U.S. law. (Def. SOF ¶ 30.) Dr. Rao admittedly that his wife had issues with his gambling and that he told his wife that he would try not to gamble to make her happy but did not stop gambling. (Def. SOF ¶ 54.) Dr. Rao's wife was not aware of how much time he spent in casinos but believed that gambling was his way to release stress. (Def. SOF ¶ 54; Pl. SOAF 18.) Dr. Rao made more than $800,000 annually and testified that he could gamble if he wanted to do so. (Pl. SOAF ¶ 18.) The Par-A-Dice Casino was issued markers[8] to Dr. Rao and by the in the spring of 2010 and Dr. Rao was late in paying other markers issued on March 30, 2010 and May 3, 2010. He was also late in repaying a $75,000 marker in July 2010, and others issued in January and February 2011. (Def. SOF ¶ 56.) After these incidents, Dr. Rao's credit was suspended by the par-A-Dice Casino. (Def. SOF ¶ 57.) Plaintiff admitted to gambling during the weekday hours of 8 am or 9 am to 5 pm, while

---

[8] Markers are a type of loan issued by casinos

employed by the University. (Def. SOF ¶ 60.) Following his resignation, Plaintiff placed himself on the Voluntary Self-Exclusion List for casinos following his resignation. (Def. SOF ¶ 60.)

Plaintiff questions Dr. Gondi's motivations and points out that Dr. Rusch informed Kaye Scholer during the investigation that she believed Dr. Gondi was making the allegations against Dr. Rao because Gondi's career at the University was coming to an end since his performance was subpar and he was unlikely to receive tenure. (Pl. SOAF ¶ 19.) In fact, Dr. Gondi also acknowledged that he had engaged in research misconduct. (Pl. SOAF ¶ 19.) To support his position that Dr. Gondi's motivations were to protect himself, something which is rather immaterial to the end result of the investigation, Dr. Rao points out that Dr. Gondi edited some of transcripts of the audio recordings that were sent to Kaye Scholer. (Pl. SOF 64) Gondi was one half of the conversation on the recordings and so was asked to review the transcript of the recordings for accuracy as one of the speakers.

Dr. Rao also takes issue Kaye Scholer's investigative tactics. (Pl. SOAF ¶ 20.) Specifically, Rao challenges the manner in which the Kaye Scholer lawyers interviewed witnesses by informing them that they had information about them prior to their interview. For example, Dr. Chetty, a lab employee testified that Sussman told him that Kaye Scholer had bank records of lab employees and that Dr. Chetty's bank records showed withdrawals corresponding to deposits made by Dr. Rao. Additionally, Dr. Desari, another lab employee, reported that University attorneys told him that other lab employees had given Dr. Rao money. (Pl. SOAF ¶ 20.) . Rao also takes issue with the fact that Sussman contacted the United States Attorney's Office ("USAO") (where Sussman was a former Assistant United States Attorney) to report allegations regarding him and that he also passed along information regarding Dr. Rao's

statements made during the internal investigation to the USAO. (Pl. SOAF ¶ 21; Pl. SOF ¶ 15.) Sussman affirmed that he had done so because his client, the University, had an affirmative obligation to report any potential misuse, misappropriation or fraud involving federal funds (and the money paid to Gondi was a part of a federal grant). (Dkt. 259 at 218:3-22.) Sussman also reported the information regarding Gondi's alleged transportation of large sums of cash for Dr. Rao (assumedly as a potential violation of federal reporting laws). (Def. SOAF ¶ 2.) Sussman testified that he did not tell anyone at the University that the USAO directed him to place restrictions or limitations on Dr. Rao. (Pl. SOF ¶ 52.) Instead, Sussman recalled that the USAO originally instructed the University not to share information regarding the USAO investigation, but at some point prior to the March 21 meeting, Sussman confirmed with the USAO was comfortable with Kaye Scholer relaying information about the investigation to Dr. Rao. (Dkt. 227-8 252:10-253:21.) Kaye Scholer never requested Dr. Rao's bank records and never asked him to sign a release for his gambling records (Def. SOF ¶ 23.)

Rao also takes issue with Kaye Scholer's conclusion regarding professional errors in his publications. Kaye Scholer concluded that there was sufficient evidence to support the allegation that Dr. Rao concealed a number of publication errors by the lab and further destroyed or directed others to destroy summaries of a review of the lab's papers screening for errors. (Def. SOF ¶ 24, Dkt 222-9 at 47:17-48:4.) Kaye Scholer concluded that this allegation was corroborated by an audio recording of Dr. Rao instructing employees to delete the summaries in addition to a forensic examination of computers, which showed that documents were deleted. (Def. SOF ¶¶ 31-32.) The forensic review was limited to the review of electronic material. (Pl. SOF ¶ 63.) Kaye Scholer did not interview Dr. Rao about the deletion of the summaries or ask him if he had a copy of the summaries, nor did McNeely ask Dr. Rao or instruct anyone to ask

whether Dr. Rao had those documents. (Pl. SOAF ¶ 16; Pl. SOF ¶¶ 50, 55, 57.) Sussman also did not ask Dr. Rao about the substance of the summaries, because he was focused on the concealment of evidence and Dr. Rao's direction to delete the summaries. (Def. SOAF ¶ 7.) Dr. Rao never told Sussman about the summaries. (Def. SOAF ¶ 8.)

With his attorney present, Dr. Rao was interviewed by Kaye Scholer on October 24, 2012, and at that time told the interviewers that his staff had reviewed the publications and had identified only three papers with errors. (Def. SOF ¶ 33.) Sussman interviewed Rao again in December 2012, and again told Sussman that there were only three papers with errors. (Def. SOF ¶ 34.)

Based on her review of one of the recorded conversations, McNeely concluded that Dr. Rao was being secretive regarding the amount of errors made by his lab and that he directed his staff to delete and not to share certain information. (Dkt. 227-6 at 218:21-219:13.) McNeely agreed that it would not be improper for Rao to tell his employees to come to him with errors and not to talk to others in the lab about it. (Pl. SOF ¶ 60.) Yet, McNeely dismissed Rao's statement that he was attempting to identify errors and get those errors fixed, after listening to the recording of the conversation between Gondi and Rao as not very credible (Pl. SOF ¶¶ 61, 70; Def. SOAF ¶ 11.) McNeely concluded this because she had never seen someone look for errors or have others look for errors and then delete the support of them. (Pl. SOF ¶ 67.) McNeely was focused on the deletion of documents. (Dkt. 258 ¶ 68.)

During the investigation, other than Dr. Gondi, all other lab employees denied being afraid of Dr. Rao when asked by outside counsel. (Def. SOF ¶ 36.) Scott; however, concluded otherwise, after listening to a recorded conversation between Rao and his staff which she determined to be threatening and menacing. (Def. SOF ¶ 35.) Sussman further found that there

was an atmosphere of fear and stress in Rao's lab, which he attributed to Rao's management style and the fact that many of the lab's employees relied on their jobs to stay in the country. (Def. SOF ¶ 35.) Kaye Scholer informed McNeely that they believed that the lab employees other than Gondi were not being truthful because they were afraid of Rao. (Dkt. 222-11 at 226:11-229:21.) Sussman based his assessment on the witnesses' demeanor and recordings of Rao which included Rao threatening the careers of employees who spoke poorly of the lab.

### The Research Integrity Investigation

In the fall of 2012, the research integrity allegations concerning errors in papers published by Rao's lab were sent to Dr. Mark Grabiner, the University's Research Integrity Officer. (Def. SOF ¶ 23.) McNeely testified that she and Grabiner were careful to keep the ethics investigation separate from the research integrity investigation. (Pl. SOAF ¶ 42.) Grabiner oversaw the procedures surrounding the allegations of research misconduct. (Pl. SOAF ¶ 3.) The research integrity process begins with a determination as to whether the matter should be reviewed by an Inquiry Team. (Pl. SOAF ¶ 1.) In his role as Research Integrity Officer, Grabiner reported to Dr. Mitra Dutta, the University's Vice Chancellor for Research. (Pl. SOAF ¶ 4.) During the pre-inquiry stage, Grabiner did not consult with Rusch. (Def. SOF ¶ 61.) As the pre-inquiry stage was concluding, Grabiner met with either Dr. Azar or Dr. Tobacmen, the Associate Dean of the University's medical school, and decided to move to the process to the inquiry stage. (Def. SOF ¶ 61.)

On October 4, 2012, Dr. Grabiner sent a letter to Rao re informing him that the University was initiating an inquiry into allegations of potential misconduct in regards to five publications. (Def. SOF ¶ 62.) Rao was the last author of four out of five of the publications, meaning that he was responsible for fixing problems with the publications. (Def. SOF ¶ 62.)

Grabiner then established the Inquiry Team with three members, though other inquiry panels established by Grabiner consisted of only two members and Grabiner could not recall why he selected three members on Rao's Inquiry Panel. (Pl. SOAF ¶ 28.) Prior to the Inquiry Team's work being conducted, the University informed Rao that the team comprised Dr. Rhonda Kineman, Dr. Beatrice Yue, and Dr. Thomas Guenther. (Def. SOF ¶ 63.) Although given an opportunity to challenge any of the proposed Inquiry Team members, Rao stated that team members were fine with him. (Def. SOF ¶ 63.)

Although he could not recall another inquiry where the respondent was not interviewed, Grabiner did not seek to interview Rao because the evidence against him was overwhelming that misconduct had occurred. (Pl. SOAF ¶ 35.) (Pl. SOAF ¶ 35.) Rao also asserts that he prepared a letter to correct an error in one of the papers before the inquiry began but according to Dr. Rao, the letter was not provided to the Inquiry Team. (Pl. SOAF ¶ 36.)

On December 17, 2012, the Inquiry Team sent Rao their report, which found that further investigation was warranted into the four publications where he was listed as the last author in addition to thirteen other publications. (Def. SOF ¶ 64.) Dr. Rhonda Kineman, one of the members of the Inquiry Team broadened the scope of the inquiry. (Pl. SOAF ¶ 10.) The Inquiry Team did not consider the fifth publication of the original set of papers under review because it was more than six years old. (Def. SOF ¶ 64.) On December 20, 2012, Rao responded to the Inquiry Team and concluded that the data duplication issue in a paper where he was the last author and Dr. Vanamala was the first author was intentional on Dr. Vanamala's part. (Def. SOF ¶ 65.) Rao also responded that of the additional thirteen papers under review, eleven needed to be corrected. (Def. SOF ¶ 65.) Rao was not limited in the information that he could give to Grabiner in his response. (Def. SOF ¶ 65.)

On January 8, 2013, Dr. Mitra Dutta, the Vice Chancellor for Research, informed Dr. Rao that she agreed with the Inquiry Team's recommendation and ordered that an investigation into the allegations be conducted. (Def. SOF ¶ 66.) The University informed Dr. Rao of the allegations against him on February 8, 2013, and the composition of the Investigation Panel on February 21, 2013. (Def. SOF ¶ 66.) On March 1, 2013, Rao challenged the composition of the Panel. On March 20, 2013, the University informed Rao of a change to the Panel. (Def. SOF ¶ 67.) Rao was given another opportunity to object to the composition of this newly comprised Panel which included Dr. Maciej S. Lesniak, Dr. Nalin M. Kumar, and Dr. Alan Diamond. He did not challenge the new Panel. (Def. SOF ¶ 67.) The Investigation Panel interviewed Rao on February 27, 2014 with his attorney present. (Def. SOF ¶ 68.) The University gave Rao the opportunity to provide any information that he wished to the Investigation Panel. (Def. SOF ¶ 68.) In his interview with the Investigation Panel. Rao indicated that as part of his oversight of the publications, he reviewed "every figure." (Def. SOF ¶ 69.) Rao also indicated that he was responsible for the lab's grants and publications. (Def. SOF ¶ 69.)

In February 2013, Rusch and Azar attended a Board meeting where the issue of Rao and the internal investigation was discussed. (Pl. SOAF ¶ 43.) McNeely, however, does not recall Drs. Rusch or Azar being present at the meeting where it was decided that Dr. Rao would be presented with the evidence of Kaye Scholer's investigation, although Dr. Rusch was aware that the meeting was going to take place and McNeely informed her that she hoped Rao would resign. (Dkt. 227-6 at 263:14-23; Dkt. 227-3 at 171:13-23.) Azar and Rusch were also part of conversations, with various updates, leading up to the decision to offer Dr. Rao the opportunity to resign. (Dkt. 227-6 at 14-23.) Dr. Rusch testified that outside of being interviewed by Kaye

Scholer and a meeting she had with McNeely in late February or early March 2013, she did not receive any other updates from them. (Dkt. 227-3 at 167:14-24.)

## March 21, 2013 Meeting

On March 21, 2013, Dr. Rao and his personal attorney attended a meeting with Scott, Sussman, and the University's employment counsel, Monica Khetarpal, of Jackson Lewis. (Def. SOF ¶ 40-41; Pl. SOF ¶ 16.) No other University employees were present at meeting. (Pl. SOF ¶ 17.) The University authorized Kaye Scholer to act on its behalf and present the evidence of the investigation. (Dkt. 258 ¶ 18.) At the time of the meeting, no one had made a determination about Rao's employment status. (Def. SOF ¶ 50; Pl. SOAF ¶ 6.)

The meeting was scheduled with little notice to Rao. Sussman was aware that Rao had some recent stress-induced health issues and that his father-in-law had recently passed away. (Pl. SOAF ¶ 24; Pl. SOF ¶ 23.) McNeely, who did not attend the meeting, was not aware of Dr. Rao's hospitalization but was aware that Rao had some recent weight loss and health concerns. (Pl. SOF ¶ 24

The Kaye Scholer lawyers presented a PowerPoint presentation embedded with some recorded conversations. The following excerpts were played for Rao at the meeting:

> RAO: I want let you guys know one thing, okay? If you guys scared and talk nonsense, it is not going to help anybody. Except one or two people don't have a data duplication, okay? Everybody have somehow or other there is a duplication. Okay? I will show each individual where their overlaps are. And we find except one or two people. That's it. (July 17, 2012) (Slide 4)

> RAO: Minor mistakes I will definitely ignore, otherwise it is coming to almost thirty, forty papers. I can't go that many papers. That way I can tell simply, "Those are minor, that's why I ignored." And as long as you guys also has to keep that secret. If that secret come out and your career done. I am telling you honestly. (July 17, 2012) (Slide 5)

> RAO: If somebody think that the lab is going to be in trouble, and if they leave someplace and if they joined any place, they may not have a job there. I will

immediately respond and send them, "These people did a scientific fraud that's why they left the lab." (July 17, 2012) (Slide 6)

RAO: I'm going to take care of it as long as you guys don't talk nonsense. And then if you guys think that, and then "oh, I can go and get a job," you'll never get in scientific field a job. If you get a job, also, I promise God, your job is removed yesterday, because of the scientific fraud. I'm not that dumb, and I'm very capable to go any extreme. (July 17, 2012) (Slide 7)

RAO: When it came out, and I have to look everybody's. That's why few people are helping. And then also, then somebody find a mistake, don't think they're personally looking. I requested them. I don't have time, that's why they're helping me to look. I really appreciate their time, and look very careful. (July 17, 2012)(Slide 8)

RAO: But I can't go and show all the mistakes, all the small mistakes, I can't do it. Only a few things then we can tell. Rest of the things we have to keep ourselves. That's why I told whoever reviewed, and then I already told them to discard everything, and then computer also they then delete. And I already told them, they already did. (July 25, 2012)(Slide 9)

(Def. SOF ¶ 42.)

The PowerPoint presentation also included audio and video clips of Rao refusing to accept a check from, Gondi and instead insisting on cash and then accepting an envelope containing cash from Gondi. (Def. SOF ¶ 40-41; Pl. SOF ¶ 16.) During the meeting, the Kaye Scholer attorneys informed Rao that he had previously told them that he had not loaned money to his employees. (Def. SOF ¶ 46.) Rao's attorney did not disagree with this description of Rao's past statements to the Kaye Scholer lawyers. Sussman offered to hear an explanation of what the envelope of cash was for during the interview and during the weekend following the meeting. Rao's attorney never offered any explanation for why Rao took cash from Gondi. Although Sussman informed him he would be open to hearing an explanation, he admitted that it was unlikely that any explanation would make a difference. (Def. SOF ¶ 46; Def. SOAF ¶ 6; Dkt. 227-8 at 180:24-181:2.)

During the confrontation meeting, Sussman denied Rao's attorney's request to listen to the entire audio recording indicating that the University did not wish to engage in full discovery at that point and only played parts of the recordings were therefore played during the meeting. (Pl. SOAF ¶¶ 22, 24.) McNeely testified that the University did not tell Sussman that Plaintiff would not be allowed to hear the entire audio recordings, but she subsequently agreed with that decision. (Pl. SOF ¶ 54.) The March 21st meeting was the first time Rao had seen the video of him accepting cash from Gondi. (Pl. SOF ¶ 48.) Sussman did not provide Rao with a copy of the PowerPoint presentation shown to him during the meeting. (Pl. SOF ¶ 34.) Sussman did not ask Rao any questions during the presentation although Rao made some unsolicited comments at the meeting. Nevertheless, Sussman informed Dr. Rao and his counsel that he did not think that anything Dr. Rao told them was going to make a difference. (Pl. SOF ¶¶ 34, 48.) McNeely concluded that Rao failed to provide a plausible explanation as to why he accepted cash from Gondi. (Def. SOF ¶ 41.) During the confrontation meeting, Sussman, with McNeely's knowledge, told Rao for the first time that the USAO was investigating the allegations against him. (Pl. SOAF ¶¶ 24, 44; Pl. SOF ¶ 28.)

At the time of the meeting, the University chose to limit Plaintiff's access to University property, computer systems, and the University collected his University-issued laptops and electronics shortly after the meeting. (47-48; Pl. SOF ¶ 40.) Khetarpal, one of the Kaye Scholer attorneys at the meeting, informed Rao that his University access was restricted but did not say how long the restriction would last. (Pl. SOF ¶¶ 29, 25.) Khetarpal, with the University's authorization, informed Rao that the University was prepared to take action to relieve him of all of his titles and duties and that in the meantime he would not be permitted to work. (Pl. SOF ¶¶ 27, 36.) Rao understood this to mean that he was being terminated. (Pl. SOF ¶ 72.) During the

meeting, the attorneys offered Rao, through his attorney, the opportunity to resign his position. (Def. SOF ¶ 43.) Khetarpal informed Rao that if he chose to resign, he could have some control over the message regarding his departure from the University and could potentially avoid a protracted tenure removal process. (Def. SOF ¶ 43.) Although Rao does not recall anyone telling him he was terminated, he believed he was being terminated. (Def. SOF ¶ 44) Rao was aware of the rights of tenured professors which would require a hearing before the University Board of Trustees, was aware that the University of Illinois statutes governed his removal, had participated in at least one removal proceeding in the past, and was represented by counsel.[9] (Def. SOF ¶ 45.) (Dkt. 227-5 at 97:16-18.)

. McNeely preauthorized the actions of the Kaye Scholer lawyers at the meeting including limiting Rao's access to the University computer systems. (Pl. SOF ¶ 20, 37.) McNeely authorized the limitation on access through the weekend until Rao notified them of his decision. (Pl. SOF ¶ 42; Def. SOAF ¶ 4.) Rusch knew that Rao's access to his office and the University computer systems would be restricted since her assistant made the arrangements to do so, but the decision to restrict access was made by McNeely. (Pl. SOAF ¶ 45; Pl. SOF ¶ 41.) As a result, Rusch did not expect that Rao could perform the same level of work as before. (Pl. SOAF ¶ 45.) Sussman testified that Rao's access was limited to protect the integrity of documents and the personal safety of University employees. (Def. SOF ¶ 47.) McNeely also testified that the restriction was applied due to the prior forensic review which indicated that files had been deleted shortly before the meeting. (Def. SOAF ¶ 4.) McNeely was aware that Rao's

---

[9] Dr. Rusch and Dr. Rao were both involved in the multi-year process to terminate the employment of a non-Indian professor, Dr. Weber, who reported to Dr. Rao. (Pl. SOAF ¶ 33.) Dr. Rusch attended the meetings and hearings that were held regarding Dr. Weber, and followed up with Dr. Rao to ensure the University's policies were being followed. (Pl. SOAF ¶ 33.)

hard drives could have been imaged in less than one day, allowing him the ability to continue his work over the weekend, but decided not to take that step and instead directed that Rao be escorted to his home by security to retrieve his University electronics.  (Pl. SOF ¶¶ 44, 45.)

Ms. McNeely knew that outside counsel was going to discuss the existence of the USAO's investigation with Dr. Rao at the meeting so that he had a fair and appropriate understanding of the severity of the information and the evidence so that he could make an informed decision.  (Dkt 227-5 at 94:10-23; Pl. SOF ¶ 33.)  McNeely testified that everyone involved in the decision agreed the USAO investigation should be included in the "script."  (Pl. SOF ¶ 33.)    McNeely chose to restrict Rao's access to the University's network because the University had just confirmed around that time that the files had been deleted. (Pl. SOF ¶ 39.) After the meeting, McNeely updated Rusch and informed her that the University was waiting for Dr. Rao's response.  (Pl. SOAF ¶ 34.)

Sussman told Rao during the meeting that he would need to give the University his decision by Monday, March 25, 2013 at 9 a.m.  (Def. SOF ¶ 51; Pl. SOF ¶ 26.)  McNeely chose the deadline in order to allow the University an opportunity to determine whether it was going take steps to make the investigation public and start the process of removing Rao from his positions.  (Pl. SOF ¶ 26; Dkt. 227-5 at 111:15-113:20; Def. SOAF ¶ 9.)

The day after the meeting, on March 22, 2013, Sussman sent an email to University counsel and McNeely relaying a conversation he had with Rao's attorney where Sussman told Rao's attorney that he had received a media inquiry but would hold off to give Rao a "chance to get his ducks in order" and that Rao's attorney indicated that he believed Rao would resign, which Sussman described as good news.  (Pl. SOAF ¶ 25.) Dr. Rao's attorney told Sussman that Rao had made up his mind within hours of the meeting and therefore Rao never asked for

additional time to consider his decision to resign (Def. SOAF ¶ 3.)   On March 25, 2013, Rao submitted a written resignation letter to the University through counsel informing the University that he was resigning from both his administrative positions and his tenured faculty position. (Def. SOF ¶ 52.)  Prior to submitting his resignation, Rao spoke with and corresponded with his attorney.  (Def. SOF ¶ 53.)  He also spoke with his children, who are attorneys and who strongly recommended that he not resign.  (*Id.*)  Dr. Rao's wife also counseled him that he should not resign.  (*Id.*)

On January 26, 2014, Rao filed this federal lawsuit against the University, and Drs. Rusch and Azar claiming they discriminated against him by interfering with his employment relationship based on his national origin—Indian, retaliated against him, and deprived him of Due Process and Equal Protection.

## Conclusion of the Research Integrity Inquiry

On July 2, 2014, more than 15 months after his resignation, and seven months after filing his federal lawsuit, Rao received a draft of the Investigation Panel's report, to which he responded through his attorneys.   (Def. SOF ¶ 70.)   Rao received the final report dated September 29, 2014.  (Def. SOF ¶ 70.)  In the final report, the Investigation Panel found that all of the papers under review suffered significant departures from accepted practice of the relevant professional community. (Def. SOF ¶ 71.)  The Panel also concluded that there were a number of instances in which "figures were duplicated, several with manipulation, and one figure plagiarized, in what was perceived by the Investigation Panel members as attempts to render the figures unrecognizable, lead[ing] to the conclusion that the practice was prevalent in the lab group and may have existed as an organized and encouraged behavior." (Def. SOF ¶ 71.)  The Investigation Panel, however, concluded that it "could not reach the level of confidence as

indicated by the term 'preponderance'" to find that Plaintiff was directly responsible for the issues with the papers under review, finding instead, that he acted recklessly. (Def. SOF ¶¶ 71, 74.)

Dr. Dutta transmitted the final investigation report to the Chancellor for disposition of the case. Rather than accepting the Investigation Panel's recommendation, however, Dr. Dutta recommended that Rao be held responsible for the errors in his lab's publications because he was the senior author on the papers, director of the lab, and responsible for the practices under his supervision and the accuracy of data submitted for publication, emphatic about his oversight of the manuscripts, and was the individual who received the federal grant. (Def. SOF ¶ 72.) Dutta found that the errors, which required the manipulation and rotation of images "show a disturbing pattern" indicative that Rao acted intentionally or recklessly and that the standard of proof had been met through Rao's testimony regarding his involvement in the manuscripts, his understanding of the policies, as well as his acceptance of responsibility. (Def. SOF ¶ 73.) In coming to her conclusions Dutta reviewed Rao's testimony, the final report, and met with Grabiner, who recommended that Rao be held responsible. (Pl. SOAF ¶¶ 4, 14.) On January 6, 2015, Rao received the Chancellor's response, which supported Dutta's recommendation. (Def. SOF ¶ 75.) Rao appealed to the President of the University arguing that the research integrity process deviated from University policy to the extent that he was deprived of due process. (Pl. SOAF ¶ 5.) The President affirmed the Chancellor's decision. (Def. SOF ¶ 75.) In February 2015, the University informed Rao that it had informed the Office of Research Integrity regarding the results of the research integrity process. (Def. SOF ¶ 76.) Rao submitted corrigenda to correct errors in nine articles. (Def. SOF ¶ 77.) In April 2016, Rao received a letter from Grabiner informing him that he, along with the Federal Office of Research Integrity,

had received new allegations of research misconduct, on figures in twelve publications, four of which were part of the previous investigation. (Def. SOF ¶ 79.)

**Dr. Rao's Claims of Discrimination**

Rao asserts that on September 19, 2012, he met with Dr. Rusch and explained that he believed he was being discriminated against because the investigation into allegations of his malfeasance was being pursued more aggressively than a previous investigation into false claims that Dr. Geiss, another University employee, made about Dr. Rao's health. (Pl. SOAF 38.) On September 22, 2012, Dr. Rao sent Dr. Rusch an email reiterating that he believed he was being discriminated against due to the alleged disparity in how the two investigations were handled. (Pl. SOAF ¶ 38.) On November 12, 2012, Rao sent another email to Rusch, copying Grabiner and McNeely, indicating that he felt that he was being subjected to racial discrimination as a result of the investigation. (Pl. SOAF ¶ 38.) In late November 2012, Rao filed a complaint of discrimination against Dr. Rusch with the University Office of Access and Equity and the University ethics office, alleging that Dr. Rusch treated him poorly in connection with an incident from 2008, when another faculty member falsely accused Rao of having cancer. (Def. SOF ¶ 37.) In the complaint, Rao also alleged that Rusch favored Dr. Gondi in connection with the investigation but has conceded that this was not discriminatory, since Gondi is also Indian. (Def. SOF ¶ 37.) McNeely investigated Rao's complaint of discrimination and concluded that Rao was supportive of the action involved with Geiss and was involved in the plan of action in 2008, regarding the false health accusations made by Geiss. (Def. SOF ¶ 38.) Sussman also investigated Dr. Rao's complaint regarding the 2008 incident, and passed along his factual findings to the University's employment counsel. (Def. SOF ¶ 39.) In January 2014, Rao filed a

Charge of Discrimination with the EEOC, alleging discrimination based on national origin and retaliation. (Def. SOF ¶ 89.)

## **Jurisdictional Facts**

The University is an employer within the meaning of Title VII of the Civil Rights Act of 1964 (Def. SOF ¶ 2; Pl. SOF ¶ 4.) Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because the case involves federal questions arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under the Civil Rights Act of 1871, 42 U.S.C. § 1983. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Dr. Rao's state law claims. (Pl. SOF ¶ 7.) Venue is proper pursuant to 42 U.S.C. § 2002e-5(f)(3) for Plaintiff's Title VII claims and 28 U.S.C. § 1391 for Plaintiff's remaining claims.

## **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the underlying substantive law that governs the dispute. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation omitted). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). Because the plaintiff bears the ultimate burden of persuasion, the defendant's summary judgment burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'"

*Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). The nonmovant must "go beyond the pleadings…to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Id.* at 1168-69 (internal quotation marks and citation omitted). Summary judgment is appropriate where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

## DISCUSSION

### I.     Exhaustion of Administrative Remedies Dr. Rao's Title VII Claims

The University first argues that Dr. Rao failed to exhaust his national origin discrimination and retaliation claims to the extent they are based on the fact that University officials reversed the findings of the research integrity Investigation Panel decision because that decision took place long after he filed his EEOC Charge of Discrimination.  (Dkt. 220 at 3-4; Dkt. 86 ¶¶ 56, 61.)

In order to maintain a claim under Title VII, a party must exhaust its administrative remedies.  *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). The scope of the subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC. *Id.* This ensures that the employer receives notice of the conduct about which the employee is aggrieved and guarantees that the EEOC and the employer have an opportunity to settle the dispute. *Cheek v. W. & S.Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).

EEOC charges should be construed liberally because they are completed by laypersons. *Cheek*, 31 F.3d at 500 (citing *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992)). A Title VII plaintiff may only bring claims included in his EEOC charge or those that that are "like or reasonably related to the allegations of the charge and growing out of such

allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir. 1971)), cert. denied, 429 U.S. 986, 97 S.Ct. 506(1976) (internal quotations omitted). "[I]n order for claims to be reasonably related to one another, there must be 'a factual relationship between them,' meaning that at a minimum they must 'describe the same conduct and implicate the same individuals.'" *Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 812 (7th Cir. 2014) (quoting *Cheek*, 31 F.3d at 500) (emphasis in original).

In his EEOC Charge of Discrimination, Dr. Rao alleged that the University's July 2012 investigation into the integrity of his lab's research was motivated by discriminatory animus based on his national origin because on two prior occasions, Dr. Rusch had refused to investigate anonymous complaints she received regarding her supervisor, Dr. Garcia, yet when she received anonymous allegations regarding Dr. Rao, she immediately investigated the charges, despite Rao's assertions that he had already investigated the allegations against him. (Dkt. 262-2.) Rao also alleged that Rusch failed to investigate claims that Rao made against other professors and as the inquiry progressed, he informed the University that he was concerned with the biased nature of the investigation. (*Id.* ¶ X.) Rao also alleged that this inquiry eventually led to his forced resignation. (*Id.* ¶ XIII.) Rao also alleged that the discrimination was continuing. (Dkt. 262-2.)

Rao's EEOC Charge of Discrimination, which includes allegations regarding the discriminatory nature of the research integrity investigation and the University's alleged retaliatory acts against him, are sufficiently related to the adverse determination in the research integrity investigation to preclude a finding that Dr. Rao failed to exhaust his administrative remedies. The allegations involve the same conduct – discrimination and retaliation predicated on the University's investigation into Dr. Rao's purported research misconduct. They also

involve the same individuals.  Although Dr. Dutta made the binding decision to reverse the panel's determination, she relied on the recommendation of Dr. Grabiner, who had been involved in the research integrity investigation since its inception. (*See, e.g.*, Def. SOF ¶ 23, 61; Pl. SOAF ¶¶ 4, 14.)  When considering these facts, and considering that Dr. Rao's EEOC complaint alleged that the discriminatory acts were ongoing due to the continuing nature of the research integrity investigation, the Court finds that Rao exhausted his administrative remedies.  *See Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (allegations of police department's refusal to transfer aggrieved officer were reasonably related to the EEOC complaint based on poor assignment, even though transfer request ostensibly came after the EEOC complaint because it "it could grow or reasonably be expected to grow out of the allegations in the EEOC charge" and involved the same individuals and conduct).

## II.     National Origin Discrimination Claims

Rao alleges that the University discriminated against him on the basis of his national origin in violation of Title VII, the ICRA, and the equal protection clause[10] when he was constructively discharged[11] and when University officials reversed the findings of the research integrity panel and purportedly imposed sanctions against Dr. Rao.  (Dkt. 283 ¶¶ 56, 73.) Defendants argue that they should be granted summary judgment as to Dr. Rao's claims of discrimination based on his national origin because based on a review of the evidence as a whole, Rao cannot show that he was meeting the legitimate job expectations, there is no evidence direct or otherwise of discrimination.   Specifically, Defendants argue that Rao's performance was not meeting the University's legitimate expectations because his lab had

---

[10] Dr. Rao's equal protection claim is analyzed under the same standards as his Title VII claims.  *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003).  *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 899 (7th Cir. 2016), cert. denied, No. 16-1032, 2017 WL 1366744 (U.S. Apr. 17, 2017).

[11] Dr. Rao limits his ICRA claim to the events surrounding his departure from the University in April 2013.

committed intentional errors in their professional publications and he attempted to cover up those errors and that he was demanding and receiving money from individuals who worked under him. Further, Defendants claim that he cannot show that he suffered an adverse employment action since he chose to resign his position with open eyes while represented by counsel and was given an opportunity to assuage the potential damage of a public display of his misconduct by resigning which he chose to do. Finally Defendants allege that he has failed to show that similarly situated employees not in his protected class were treated more favorably. (Dkt. 220 at 5.) Defendants do not dispute the fact that Dr. Rao is a member of a protected class. (Dkt. 220 at 6.) Defendants argue instead that even if Dr. Rao can make out a prima facie case of discrimination, the University had legitimate reasons for taking the actions that it did, and Dr. Rao cannot show those reasons were mere pretext. Simply put, according to Defendants, based on a holistic view of the evidence, a reasonable jury could not infer that Dr. Rao was discriminated against based on his national origin.

"[I]n enacting Title VII of the Civil Rights Act of 1964, Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin, and ordained that its policy of outlawing such discrimination should have the "highest priority." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (internal citation omitted) (collecting cases). Specifically, Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2. When plaintiffs allege that they have been treated differently because of their race, as plaintiff has here, he must prove the "employer had a

discriminatory motive for taking a job-related action." *Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016).

Until very recently, a district court would separate evidence into two categories when examining discrimination claims. First, a district court would determine whether the plaintiff had satisfied the so-called "direct method" of proof; that is, it would look to see whether the plaintiff had "present[ed] sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Harper v. Fulton Cnty.*, 748 F.3d 761, 765 (7th Cir. 2014) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)) (internal quotation marks omitted). Second, a district court would determine whether plaintiff had satisfied the "indirect method" of proof as described in *McDonnell Douglas Corp*. Under the indirect method of proof, a plaintiff could shift the burden of proof to the defendant after making a prima facie case of employment discrimination, showing: that "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016) (internal quotations and citations omitted). If the plaintiff made out a prima facie case, the burden would shift to the defendant to give a non-discriminatory reason for treating the plaintiff the way it did, and if the defendant met that burden, the burden would shift back to the plaintiff to show that the defendant's explanation was just a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802, 804. Pretext means "'a dishonest explanation, a lie rather than an oddity or an error.'" *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)).

The distinction between "direct" and "indirect" evidence in employment discrimination claims has been cast aside and the Seventh Circuit overruled numerous decisions "to the extent that these opinions insist on the use of the direct-and-indirect framework." *Ortiz v. Werner Enter.*, 834 F.3d 760, 765-66 (7th Cir. 2016). The critical question is not the type of evidence presented but rather from examining the evidence as a whole, "whether a reasonable jury could infer the existence of discrimination or retaliation." *Malekpour v. Chao*, No. 16-3440, 2017 WL 1166872, at *3 (7th Cir. Mar. 29, 2017) (quoting *Cole*, 838 F.3d at 899–901.

Although *Ortiz* did not concern the *McDonnell Douglas* burden-shifting framework applied in many employment discrimination suits, recent Seventh Circuit opinions since *Ortiz* have reiterated that the *McDonnell Douglas* framework "refers to a common, but not exclusive, method of establishing a triable issue of intentional discrimination." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (emphasis added) (internal quotation marks omitted). Indeed, even after *Ortiz*, the Seventh Circuit has recognized that "*McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Because, *Ortiz* did not undermine the *McDonnell Douglas* framework and the parties presented their evidence and arguments under that rubric, the Court will first examine the evidence as a whole through that lens. For the reasons discussed below, Dr. Rao has not presented sufficient evidence, direct, indirect, circumstantial, or otherwise to allow a reasonable jury to conclude that Dr. Rao was discriminated against based on his national origin.

**A. Adverse Employment Action**

The Court starts its analysis by defining the scope of potential adverse employment actions suffered by Dr. Rao. "An adverse action for a discrimination claim must materially alter the terms or conditions of employment to be actionable." *Malekpour*, 2017 WL 1166872, at *2 (internal quotation and citations omitted).

Dr. Rao argues that he suffered several different adverse employment actions: (1) his alleged constructive discharge; (2) the investigations into his misconduct; and (3) the University's decision to hold him responsible for the lab's research errors and accompanying sanctions. (Dkt. 260 at 3-4.)

Defendants argue that Rao's departure from University employment did not constitute an adverse employment action because he voluntarily resigned his positions after consulting with counsel and family members and was given more than three days to make his decision. (Dkt. 220 at 8.) For reasons discussed extensively in the Court's analysis of Rao's due process claim, there are several issues of fact that could lead a reasonable jury to conclude that he was constructively discharged or coerced into resigning. Rao fails to substantively address how the investigation itself or the undefined "events leading up to discharge" could be considered adverse employment actions, nor is there evidence to support that conclusion. (Dkt. 260 at 2-3.) Threats of adverse action or "dark hints of future adverse employment action" are not adverse employment actions when evaluating Title VII claims. *Dunn v. Wash. Cty Hosp.*, 429 F.3d 689, 692–93 (7th Cir. 2005); *see also Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 697 (7th Cir. 2017) ("unfulfilled threats of discipline" are not actionable). As to the last alleged adverse action, the University does not contest that the determination to hold Rao responsible for

his lab's errors as part of the research integrity decision was an adverse employment action. (*See* Dkt. 274.)

**B. Dr. Rao's Performance**

Defendants argue that Rao cannot show that at the time of his resignation he was performing his job to the University's legitimate expectations. In support, they point to the results of Kaye Scholer's investigation, which concluded that there was evidence to support allegations that Rao had directed staff to delete documents summarizing research errors and that Rao had accepted cash payments from at least one employee, ostensibly to help keep the extent of his gambling habit concealed from his wife. (Dkt. 220 at 6-7.) As explored more fully below, Rao attacks the conclusions of Kaye Scholer's investigation and their methodology, but cannot and does not dispute that he accepted cash payments from Dr. Gondi. (Def. SOF ¶ 40-41, 46; Def. SOAF 6Pl. SOF ¶ 16; Dkt. 260 at 9; Dkt. 227-8 at 180:24-181:2.) Instead, he attacks Gondi's financial situation, purported instances where Gondi withdrew large amounts of cash and did not provide them to Rao, questions Gondi's motivation in making allegations against him, downplays his own gambling problem, and attempts to classify the payments as loans to Gondi money, all of this in spite of his lack of denial that he ever received cash from employees. (Dkt. 260 at 9.) It is undisputed that Kaye Scholer concluded that Rao directed employees to delete summary documents examining the amount of errors in papers and conceal the amount of publication errors. (Def. SOF ¶ 24, Dkt 222-9 at 47:17-48:4.) This conclusion was corroborated in part by a forensic examination of electronic material and audio recordings of Rao addressing his lab employees, that even Rao conceded are "potentially incriminating." (Def. SOF ¶¶ 31-32, 42; Dkt. 260 at 15.) Although Rao challenges the motivation of Gondi and the procedures employed by Kaye Scholer, what he fails to do is present any evidence that would allow a

reasonable juror to conclude that professional errors in publications, pressuring employees for cash, or deleting evidence are actions demonstrating that one is fulfilling the legitimate job expectations of a Professor and Doctor in the University. Instead, there is ample evidence in the form of electronic recordings (evidencing his direction to employees regarding the deletion of evidence), forensic computer analysis (evidencing the deletion of files that should have been saved to support the research in the lab), and video recordings (evidencing the payment of cash from an underling to Rao when Rao had previously denied receiving cash from any employees). These are not the legitimate expectations that a University holds for an employee in higher education who is receiving one of the top salaries in the University for his alleged professional work. At this level of education, each writing and action of a professor bearing the University's name is expected to be of the highest caliber and of the utmost integrity or the very nature of the University's work is undermined. In keeping with this risk, numerous processes were in place at the University to review the professional integrity of all employees at the highest levels. Based upon the University's own investigation, Rao was not fulfilling those expectations.

Nor can Dr. Rao establish that at the time Dr. Dutta reversed the findings of the research Investigation Panel and recommended that Dr. Rao be held responsible, he was performing to University's legitimate expectations. By that time, the Investigation Panel found that many of the papers under review suffered significant departures from accepted practice of the relevant professional community. (Def. SOF ¶ 71.) The Panel also noted that "figures were duplicated, several with manipulation, and one figure plagiarized, in what was perceived by the Investigation Panel members as attempts to render the figures unrecognizable, leads to the conclusion that the practice was prevalent in the lab group and may have existed as an organized and encouraged

behavior." (*Id.*) Prior to that point, Dr. Rao had accepted responsibility for the research coming from the lab and even averred that he reviewed the figures very carefully. (Def. SOF ¶ 17, 73.)

Instead of pointing to evidence that he performed to legitimate expectations, without evidentiary support, Rao instead argues that his lab did not commit an unprecedented amount of errors and argues that all professors, including Drs. Azar and Garcia had similar types of errors. (Dkt. 220 at 4.) This argument, however, misses the point, as neither of those professors was alleged to be involved with the significant number of errors as Dr. Rao and neither had findings of serious misconduct and plagiarism, as Rao did. Nor was there evidence that either attempted to delete evidence that might show that the numbers were being intentionally altered. In fact, both were found to be inconsequential in nature as opposed to the intentional nature of Rao's findings. The fact that Dr. Rao corrected so many papers following the investigation supports the notion that the findings against him were justified and the scope of the investigation was appropriate. (Def. SOF ¶ 65.)

### C. Similarly Situated

Defendants argue that Rao has not and cannot identify any similarly situated non-Indian employee who was treated differently under similar circumstances. (Dkt. 220 at 11.) Determining whether employees are similarly situated is a "flexible, common-sense, and factual" inquiry. *Coleman*, 667 F.3d 835 at 841. "Relevant factors include 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications.'" *David*, 846 F.3d at 225–26 (quoting *Warren v. Solo Cup Co.*, 516 F.3d 627, 630 (7th Cir. 2008)).

When examining the record in the light most favorable to Rao, the record does not contain evidence of another similarly situated employee, Indian or otherwise, who was the

subject of similar ethics investigations and was treated differently.  In unrelated sections of his response, Rao references his own  participation in the termination of Dr. Weber but fails to present any evidence in how the two doctors were similarly situated.

As to the research integrity investigation, Rao avers that Dr. Azar and Garcia were treated differently, yet fails to show that the decision-makers in his investigation – Dr. Dutta, who was also Indian, or the University President, played any role in the investigations of Drs. Garcia and Azar. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff."  (citing *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir.2002); *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir.2000))); *see also Coleman*, 667 F.3d at 847 ("The inference of discrimination is weaker when there are different decision-makers, since they 'may rely on different factors when deciding whether, and how severely, to discipline an employee.'") (quoting *Ellis v. United Parcel Serv.*, 523 F.3d 823, 826 (7th Cir.2008)).

Dr. Rao also fails to adequately show that the conduct of Drs. Azar and Garcia was similar to his own.  Dr. Rao was accused of errors in close to 20 papers including plagiarism and manipulation, while Drs. Garcia and Azar were under review for a narrow set of alleged errors in a small amount of papers all of which were determined to be minor oversights not intentional manipulations.  (Def. SOF ¶ 64.) Although Rao purports to attack the procedures used in the different inquiries, he really challenges the results.  Dr. Rao's recognition that many of the errors identified by the research integrity investigation needed to be corrected belies the conclusion that their findings were substantiated. (Def. SOF ¶ 65.)

**D. Pretext and Evidence of Discrimination**

Rao has also failed to identify a disputed issue of material fact as to the legitimacy of the University's proffered reason for his purported constructive discharge or otherwise raise an issue of fact that could lead a reasonable jury to conclude that his alleged termination or the research integrity decision resulted from discriminatory animus. Dr. Rao does not present any evidence of overt discrimination based on his national origin. Instead, Dr. Rao spends much of his response brief attacking the methodology and conclusions of Kaye Scholer's investigation, arguing that it was a sham and came to the wrong conclusion. Dr. Rao asserts, often without evidentiary support, that Kaye Scholer allegedly: (1) bullied lab employees; (2) falsely represented the amount of information they had in attempts to get information from lab employees; (3) used leading questions in their interviews with lab employees; (4) disclosed allegations about him to lab employees; (5) reported his alleged misconduct to the USAO before the investigation concluded and without telling him; (6) did not ask him why he purportedly destroyed files; (7) ignored exculpatory evidence;[12] (8) failed to subpoena or ask for his bank records; and (9) ignored Gondi's poor performance as a motivation for Gondi to have lied to them. (Dkt. 260 at 14. (Dkt. 260 at 13-14.)[13]

These issues do not raise a question of fact as to whether Kaye Scholer's investigation was a sham. First, as Rao himself concedes, if anything, the investigation was too thorough as he was "interviewed multiple times and his direct reports were interviewed sometimes two to three times." (Dkt. 260 at 13.) In addition to the interviews, the investigation included a forensic analysis of electronic material and a review of grant and audit information. (Def. SOF ¶¶

---

[12] This assertion is clearly belied by the record as Kaye Scholer's investigation evaluated the list of 12 allegations lodged against Dr. Rao and concluded that 10 of those allegations were not supported by sufficient evidence. (Def. SOF ¶ 27; Pl. SOF ¶ 13.)

[13] "[I]n many cases, analysis of the 'legitimate expectations' prong of the prima facie case is very much akin to, or merges with, the question of pretext." *Vaughn v. Vilsack*, 715 F.3d 1001, 1007 (7th Cir. 2013).

24, 31-32.)  *See, e.g., Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 729, 733 (7th Cir. 2011) (concluding that the employer conducted a reasonable investigation of a co-worker's accusation of sexual harassment against plaintiff by interviewing plaintiff, the complaining co-worker and two witnesses).  Furthermore, Rao fails to explain how any of Kaye Scholer's actions departed from standard investigative techniques, let alone could lead to an inference of national origin discrimination, especially when the investigation began before Kaye Scholer's involvement. In fact, undisputed testimony supports the propriety of Sussman's contacts with the USAO due to the University's obligation to report any allegations of potential misconduct involving federal grants to the USAO, which asked that they not discuss the investigation with him.  (Dkt. 259 at 218:3-22.)

Rao spends much of his brief attempting to create a factual issue as to the conclusions of Kaye Scholer's investigation, yet he does not dispute that Kaye Scholer had reasons to conclude that he accepted cash payments from at least one lab employee, Dr. Gondi. (Def. SOF ¶¶ 28-29.) Evidence of that conclusion is supported by (1) a video recording of him refusing to accept a check from Gondi and instead accepting cash; (2) certified bank records reflecting withdrawals from Gondi's accounts; (3) Rao's last minute concession that he "loaned" Gondi money, after denying during earlier interviews that he had ever loaned any money to anyone who worked for him, allegedly to cover up the true reason for accepting cash from him.  (*Id.*) Furthermore, Rao does not directly address the fact that there is an audio recording of him directing his employees to conceal the extent of the lab's errors and directing others to delete evidence of the errors. (Def. SOF ¶ 42.) In fact, Rao concedes that the audio recordings are "potentially incriminating" and does not refute the accuracy of the recordings. (Dkt. 260 at 15.)  Instead, he attempts to cast aspersions on Gondi again because he had a hand in "editing" the transcripts where his voice is

heard on the recordings – a task done to verify what was being said by the actual speaker. The audio also contains Rao himself speaking of pervasive errors in the lab but he only conceded that three papers contained errors in his interviews with Kaye Scholer. (Def. SOF ¶ 42.) Instead, he points to inadmissible evidence purporting to show that he kept a copy of the summary, apparently consistent with the recording indicating that he would keep the summary. This assertion does not undercut Kaye Scholer's conclusion that Rao *directed* his employees to conceal and delete the summaries. (Def. SOF ¶ 24, Dkt 222-9 at 47:17-48:4.) Similarly, Rao cannot undermine the results of the research integrity investigation, which found that due to his reckless conduct, he was responsible for the troubling pattern of errors in papers published by his lab, as he moved to correct more than ten of those papers. (Def. SOF ¶ 73.) The reasonable and supported conclusions reached by Kaye Scholer preclude Rao from demonstrating causation between the investigation and his alleged discharge. *Taleyarkhan v. Trustees of Purdue Univ.*, 607 F. App'x 548, 551 (7th Cir. 2015) (finding that summary judgment in favor of university in discrimination suit brought by professor was appropriate when investigation independently affirmed allegations because plaintiff could not show causation).

Instead of disputing these facts, as the Court gave him two opportunities to do by permitting a second filing under Local Rule 56.1, Rao cites to what he considers exculpatory information that he believes was ignored by Kaye Scholer which s could have led Kaye Scholer to a different conclusion. Even assuming for the sake of argument that the investigation had missteps or that they could have come to a different conclusion, "[w]e have repeatedly emphasized that when assessing a plaintiff's claim that an employer's explanation is pretextual, we do not second-guess an employer's facially legitimate business decisions. An employer's reasons for firing an employee can be foolish or trivial or even baseless, as long as they are

honestly believed." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016), cert. denied, 137 S. Ct. 1115, 197 L. Ed. 2d 185 (2017) (internal citations and quotations omitted). Rao has done nothing to undermine the University's stated conclusions, instead he "merely quibbles with the wisdom of his employer's decision." *Lord*, 839 F.3d at 565. Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a "lie, specifically a phony reason for some action." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir.2006) (citation omitted)). Rao has not raised an issue of fact as to whether the University's proffered reason for its actions was pretextual.

Rao also argues that the University's failure to follow its own internal procedures evidences its discriminatory motivation. (Dkt. 260 at 17.) In support, Rao points to several alleged departures from procedure in his investigation, many of which are immaterial, not supported by the cited evidence, admissible evidence, or are based on facts that were disregarded due to violations of Local Rule 56.1 These include: (1) Dr. Rusch's formation of a "Dean's Committee" instead of her making a determination that the allegations constituted research misconduct (lacks foundation); (2) Dr. Rusch appointing Dr. Alarcon to the Dean's Committee "even though Dr. Rusch was aware that Dr. de Alarcon's supervised Peggy Mankin, who was the person who brought Gondi's anonymous allegations to Dr. Rusch's attention, and that Mankin funneled the allegations to Dr. Rusch through Dr. de Alarcon" (not supported by cited evidence); (3) the alleged distribution of the Dean's Committee's preliminary report) (this fact was disregarded as it was the fifth assertion included in the statement); (4) Dr. Rusch's alleged failure to review the allegations (not supported by cited evidence); (5) Dr. Grabiner's establishing a three-member Inquiry Panel instead of a two-member Inquiry Panel (immaterial); (6) the fact that the Inquiry Panel expanded the scope of its investigation to thirteen additional papers, where it also found

errors (immaterial); (7) Dr. Grabiner provided inculpatory information to the Inquiry Panel but did not provide them with certain exculpatory information (not supported by cited evidence); (8) Rao was not interviewed as part of the research integrity investigation (immaterial). (Dkt. 260 at 18-22.)  Without citation or factual support, Rao also attacks the procedures employed in the investigation stage of the research integrity investigation, despite the fact that that phase of the investigation resulted in recognition that there was research misconduct in the lab but a recommendation that Rao not be held personally liable for the misconduct. Without explanation, Rao also alleges that discrimination can be inferred from Dr. Rusch's failure to prevent the March 21, 2013 meeting and then in the next sentence criticizes her for not attending the meeting.  (Dkt. 260 at 23.)

While straying from employment policies can potentially indicate discriminatory intent, the University's alleged departures cannot lead to such an inference here because "we do not require that an employer rigidly adhere to procedural guidelines in order to avoid an inference of retaliation. Instead, we look for pretext in the form of 'a dishonest explanation, a lie rather than an oddity or an error.' Moreover, when independent surrounding circumstances indicate that the employee's performance was seriously deficient and worthy of disciplinary action, a procedural abnormality will not suffice to establish a [discriminatory or] retaliatory motive." *Kidwell v. Eisenhauer*, 679 F.3d 957, 969 (7th Cir. 2012).  As discussed extensively above, Rao has failed to present sufficient evidence to undermine the proffered reasons for his termination and the determination to hold him responsible for his lab's errors.  Dr. Rao "cannot demonstrate a [discriminatory or] retaliatory motive based on a technical violation of policy when the circumstances reveal a pattern of deficient actions on his part." *Kidwell*, 679 F.3d at 971; *Guinto v. Execlon Generation Co., LLC*, 341 Fed. Appx. 240, 246-47 (7th Cir. 2009) ("it is immaterial

whether [the employer] failed to follow internal protocols or rejected him based on subjective criteria . . . [b]ecause the decision-makers' stated reasons have gone unrebutted").

### E. Illinois Civil Rights Act of 2003 Claim

Rao's ICRA claim fails for the same reasons his Title VII discrimination claim fails. Specifically, the statute allows courts to declare that "any unit of state, county or local government has adopted 'methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender.'" *Cent. Austin Neighborhood Ass'n v. City of Chic.*, 2013 IL App (1st) 123041, ¶ 20. Section 5 of the ICRA was not intended to create new rights but merely created a new venue—state court—for discrimination claims under federal law. *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015), cert. denied sub nom. *Dunnet Bay Const. Co. v. Blankenhorn*, 137 S. Ct. 31, 196 L. Ed. 2d 25 (2016) (citing *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 368 Ill.App.3d 321, 305 Ill.Dec. 655, 856 N.E.2d 460, 467 (2006)). Other courts within this district have determined that the ICRA "was expressly intended to provide a state law remedy that was identical to the federal disparate impact canon." *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010). Accordingly, when interpreting the ICRA, courts "look to cases concerning alleged violations of federal civil rights statutes to guide our interpretation." *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015) (collecting cases).

### III.  Retaliation

### A.     Retaliation Under Title VII

In addition to banning discrimination based on national origin, Title VII also forbids employers from discriminating against employees who "opposed any practice" prohibited by Title VII or who "made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). To survive the University's Summary Judgment motion on his Title VII retaliation claims, Rao "must produce enough evidence for a reasonable jury to conclude that (1) []he engaged in a statutorily protected activity; (2) the Board took a materially adverse action against h[im]; and (3) there existed a but-for causal connection between the two." *Burton*, 851 F.3d at 695. "[A]n adverse action for retaliation purposes must be serious enough to dissuade a reasonable employee from engaging in protected activity." *Malekpour*, 2017 WL 1166872, at *2. The dispositive question is whether a reasonable jury could find a causal link between the protected activities and the adverse actions and because the University has presented non-retaliatory explanations for its actions, "the true question is whether the proffered reasons were pretext for retaliation." *Burton*, 851 F.3d at 697. "Without direct evidence of causation, [Rao] must rely on circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Id.*

In his complaint, Rao alleges that the University retaliated against him for his fall 2012 complaint regarding the investigation into his alleged misdeeds. (Dkt. 283 ¶ 60.) He alleges that the retaliatory acts were his constructive discharge and finding that he was responsible for research misconduct at the end of the research integrity investigation. (Dkt. 85 ¶¶ 60-61.) His response to Summary Judgment, however, articulates a different theory. Rao now asserts that he engaged in protected activity on September 19, 2012, when he had a conversation with Dr. Rusch where he raised concerns about the investigations. (Pl. SOAF ¶ 38.) According to Rao, in that conversation, he purportedly complained that the investigations into his alleged misconduct were discriminatory, especially when compared to how the University handled the inquiry of Dr. Geiss, a University employee, who falsely spread the rumor that Rao had cancer in 2008. (Dkt.

260 at 25; Pl. SOAF 38.)   In the 2008 inquiry, the matter was not referred to the University's Ethics Office but instead Rusch mediated the situation and asked Rao to accept an apology from Geiss.   McNeely investigated Rao's complaint of discrimination and concluded that Rao was supportive of the action taken with  Geiss back in 2008 and was even  involved in the plan on how to deal with Geiss's  false health statements made by Geiss against him. (Def. SOF ¶ 38.) In November 2012, Rao filed a formal complaint with the University.  Rao points to the hiring of outside counsel and the alleged escalation of the investigation following his complaint as retaliatory acts for filing the complaint.  Dr. Rao also points to the "suspicious timing" of the decisions to escalate both investigations within days of Dr. Rao's initial as evidence of a causal link between the purported protected activity and the alleged retaliatory acts.  (Dkt. 260 at 27.)

By pointing to his September 2012 complaint, Dr. Rao attempts to insinuate that the investigations into his misconduct were instigated or "escalated" by his complaints of discrimination.  Rao relies on the fact that the scope of the research integrity investigation was purportedly expanded by Grabiner three days after he sent an email to Rusch claiming that the investigation was discriminatory and that around the same time, the scope of the research integrity investigation was expanded from a review of five to eighteen papers.  Putting aside whether the escalation of an already existing investigation can constitute retaliation when the investigation into misconduct predated the alleged retaliation, Rao misstates the evidence presented to the Court.  First, the investigations into Rao began in July 2012, before he ever made any allegations of discriminatory treatment.   (Def. SOF ¶ 16.)   The fact that the investigation increased in magnitude does not show suspicious timing when the increase in magnitude was based on the evidence that was being uncovered requiring a deeper look into his alleged misconduct at the time.    Second, even if the Court were to accept that the hiring of

counsel and expansion of the research integrity investigation were suspiciously timed, "'suspicious timing alone is rarely enough to survive summary judgment.'" *Nichols*, 755 F.3d at 605 (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013). Indeed, Rao has failed to identify other evidence that could lead to the conclusion that he was retaliated against, especially in light of two independent and corroborated investigations that found he had committed misconduct. Third, Rao fails to point to any evidence, nor has any been presented to the Court, to support the inference that McNeely even knew about Rao's discrimination allegations at the time she began the discussions to engage outside counsel. In fact, uncontroverted testimony indicates that McNeely engaged outside counsel due to the seriousness of the allegations against Rao and her concerns about the amount of time such an investigation would take her. (Def. SOF ¶ 24, Dkt 222-9 at 47:17-48:4.) Rao also fails to link the expansion of the research integrity investigation, which was broadened by Dr. Rhonda Kineman, one of the members of the Inquiry Team, to his complaints about Dr. Rusch. (Pl. SOAF ¶ 10.)[14]

Furthermore, to the extent that Rao alleges that he was retaliated against for reporting that Drs. Azar, Garcia, and Prabhakar committed research misconduct, his argument fails because those allegations cannot be considered protected conduct. To be protected under Title VII, his complaint must have indicated "the discrimination occurred because of sex, race, national origin, or some other protected class . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Cole*, 838 F.3d at 901 (quoting *Orton–*

---

[14] Dr. Rao also alleges that the investigation was expanded to examine 13 additional papers based on a document titled "supplement to the Peoria Special Committee Report," which he calls a falsified report. There is no evidence to support the conclusion that this document is falsified and as Defendants point out in their reply, the document was considered by the Inquiry Team which noted that the Dean's Committee or the Inquiry Team did not issue any allegations based on the document but left open the possibility of the Investigation Team analyzing the document. (Dkt. 274 at 13.)

*Bell v. Indiana*, 759 F.3d 768, 776 n.6 (7th Cir. 2014)). There is no evidence that his allegations against Drs. Garcia, Azar, or Prabhakar, a fellow Indian, were in any way tied to his own national origin discrimination claims. (Def. SOF ¶ 80.) In fact, his allegations appear to be his quid pro quo against those doctors because Drs. Azar and Garcia would potentially be reviewing allegations of his misconduct. Since there is simply no evidence in the record to link the complaint against them to a retaliatory act on the part of the Defendants, these allegations cannot serve as the basis for his retaliation claims and the only potential protected activity are Rao's complaints from the fall of 2012 that the investigation was discriminatory.

Rao has also failed to create an issue of fact as to whether the hiring of outside counsel and continuation of the investigations into his misconduct was an adverse employment action. That is because he has failed to argue that these actions were "serious enough to dissuade a reasonable employee from engaging in protected activity." *Malekpour*, 2017 WL 1166872, at *2. *See Dunn*, 429 F.3d at 692–93 ("dark hints of future adverse employment action" were not adverse employment actions for Title VII retaliation purposes). Once again, Rao must overcome the obstacle that the investigation had already begun into his alleged misconduct before he made the complaints, and beyond that, he must be able to show that the University's hiring of outside counsel served as a retaliatory adverse employment action. But a University, like any employer, may seek outside counsel at any time to handle matters that it deems to be sensitive and time-consuming without running the risk of that representation running afoul of the civil rights laws. Suggesting otherwise would most certainly be against public policy which permits individuals and entities to hire attorneys to handle both complex and simple matters as a matter of discretion.

Rao also cannot show that the University's decision to hold him responsible for the lab's publication errors was a retaliatory act. It is undisputed that in 2014, Dr. Dutta made the

recommendation to hold Rao responsible for the research misconduct of the lab, a decision that was affirmed by the University's President. (Def. SOF ¶ 72.) Rao has not pointed to any evidence that Dutta, a fellow Indian, or the President, were aware of Rao's allegations against Drs. Azar, Garcia, and Prabhakar. Even if they were aware, however, it is uncontroverted that the investigation began before Rao complained about the others who had alleged errors in their professional work, there was an independent investigation into Rao's work and the others' work, there were recommendations made to Dutta and those recommendations included very dissimilar findings—the others were deemed to be inconsequential, non-intentional and were rectified immediately; whereas, Rao's were deemed to be significant, intentional, and obstructive. The recommendation to Dutta was based on uncontroverted and substantial evidence including video and audio recordings and forensic computer evidence. To suggest that the "real reason" Dutta was holding Rao responsible for the misconduct was because he complained of other researchers' typos long after his investigation was underway defies credibility and no reasonable juror could infer such. Yet, even if the Court were to assume Dr. Azar and Dr. Rusch had animus against Dr. Rao for his complaints against them he has not demonstrated that the "animus had [any] influence on the ultimate adverse action." *Poullard v. McDonald*, 829 F.3d 844, 856–57 (7th Cir. 2016) (citing *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015)). "If the ultimate decision-maker does determine whether the adverse action is entirely justified apart from the supervisor's recommendation, then the subordinate's purported bias might not subject the employer to liability. This is consistent with our previous holdings that 'the chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee.'" *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015) (quoting *Schandelmeier–Bartels v. Chi. Park Dist.,*

634 F.3d 372, 383 (7th Cir.2011)); *Nichols*, 755 F.3d at 604 (sworn statements that showed that plaintiff's termination "had nothing to do" with statements from party with animus against plaintiff meant that the animus was "not a proximate cause" of the termination). As discussed extensively in relation to his national origin discrimination claims, Rao cannot show retaliation because his alleged constructive discharge and the research integrity decision were conducted by different decision makers for legitimate reasons that Rao has failed to controvert. As discussed above, Kaye Scholer came to the non-pretextual and independently corroborated conclusion that Rao had engaged in misconduct, as did Dr. Dutta, when finding Rao culpable for his lab's errors. Indeed, following the research integrity investigation, Rao corrected a number of papers that contained errors, including papers contained in the expanded list, which he claims was prompted by retaliatory animus. (Def. SOF ¶ 65.) This fact completely undercuts his argument that the research integrity investigation was a sham or that it was motivated by retaliatory animus, as his corrective action in itself indicates his belief that the allegations were substantiated. "When confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired even absent his complaints about harassment." *Lord*, 839 F.3d at 564; *see also Burton*, 851 F.3d at 698 (affirming summary judgment for university on retaliation claim where university official "had a factual basis for each of the allegations she leveled against [plaintiff] . . . and [plaintiff] failed to provide evidence that the allegations were pretextual). Additionally, the significant time gap between the alleged protected activity in the fall of 2012 and the alleged adverse actions in March 2013 and the research integrity decision in 2014, "substantially" weakens his retaliation claim. *See Burton*, 851 F.3d at 698.

Lastly, throughout his response, Rao also undercuts his retaliation claim by repeatedly asserting that Gondi, a fellow Indian, and member of Rao's lab, caused the investigation into

Rao's lab that led to the research integrity investigation and his departure from the University rather than the retaliatory action of the Defendants for his alleged complaint about the investigation. (*See, e.g.*, Dkt. 260 at 8) ("not a single one of Dr. Gondi's colleagues corroborated his claims, that 11 of the 12 other allegations by Dr. Gondi were known by the University and Kaye Scholer to be false. . . Dr. Gondi's claims as to the payments made were inconsistent"); *see id.* at 14 ("the meritless allegations that were being made by Gondi"). But word of Rao's complaints about the investigation did not trigger the investigation itself and Gondi's allegations were corroborated by the audio and video recordings. For these reasons, the University is entitled to summary judgment on Rao's Title VII retaliation claim.

**B.      Dr. Rao's Retaliation Claim Against Dr. Rusch Pursuant to the State Officials and  Employee Ethics Act**

Rao also claims that Dr. Rusch improperly retaliated against him in violation of the Illinois State Officials and Employees Ethics Act ("SOEEA"), which prohibits retaliation against state employees who disclose illegal activity where the protected activity was a "contributing factor" in the retaliatory actions. *See* 5 Ill. Comp. Stat. Ann. 430/15-10; *Carmody v. Bd. of Trs. of Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014).

In his complaint, Rao alleges that he was retaliated against when Rusch "escalated" the investigations into his misconduct after he filed his November 2012 complaint with the University Ethics Officer regarding the investigation into his misconduct and also when he reported that three professors had errors in their papers in November 2012. (Dkt. 283 ¶¶ 63-67.) His SOEEA claim does not mention the research integrity decision.

Defendants argue that Rao has not alleged that Rusch was responsible for a retaliatory act, as Rush was only alleged to have "escalated" the investigation, which does not constitute a retaliatory act under the statute, which is limited to any "reprimand, discharge, suspension,

demotion, denial of promotion or transfer, or change in the terms or conditions of employment."

5 Ill. Comp. Stat. Ann. 430/15-10; (Dkt. 220 at 17.) Defendants also argue that even if there

were an issue of fact as to Rusch making a retaliatory act, summary judgment is still appropriate

because it is undisputed that the University "would have taken the same unfavorable personnel

action in the absence of that conduct." 5 Ill. Comp. Stat. Ann. 430/15-20.

As a threshold matter, Rao failed to respond to Dr. Rusch's arguments regarding

summary judgment on his SOEEA claim. As such, he has waived opposition to the argument.

*See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an

argument . . . results in waiver."). Even if the Court were to examine the substance of the claims

without his input, summary judgment is still appropriate for the reasons articulated by

Defendants and similar reasons that justify granting summary judgment on his Title VII

retaliation claims.[15] First, the "escalation" of the investigation in November 2012 does not

constitute a retaliatory act under the SOEEA. Second, Rao has failed to identify any evidence

that the investigation escalated following his purported protected activity in November 2012 or

that Rusch was involved in any such escalation. Lastly, as discussed in detail above, there is no

evidence linking the alleged protected activity and the retaliatory acts, nor has Rao created any

doubt as to the legitimate reasons for investigating Rao's misconduct, as discussed in depth in

the Court's analysis of Rao's national discrimination claim. As a result, summary judgment in

favor of Defendants is appropriate on Rao's SOEEA claim.

## III.    Dr. Rao's Section 1983 Claims

Rao also alleged that Drs. Rusch and Azar deprived him of his constitutional rights to due

process and equal protection in violation of Section 1983. Specifically, he alleges that they

---

[15] *See, e.g., Hosick v. Chic. State Univ. Bd. of Trs*, 924 F. Supp. 2d 956, 975 (N.D. Ill. 2013) (considering judicial interpretations of Title VII when analyzing SOEEA claim because there were no relevant state court interpretations of the SOEEA).

deprived him of his property interest in his employment when they participated in the decision to constructively discharge him and engaged in the research integrity investigation where both processes lacked due process. (Dkt. 86 ¶¶ 79-84.)  Rao also alleges that Drs. Rusch and Azar deprived him of his constitutional right to equal protection when they treated him differently than other similarly situated individuals outside of his protected class.[16]  (*Id.* ¶¶ 85-91).  Section 1983 creates a cause of action against "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

### B.     Due Process

Both sides have moved for summary judgment on Rao's Due Process claim.  "To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.  Accordingly, a plaintiff asserting a procedural due process claim must have a protected property interest in that which [he] claims to have been denied without due process."  *Price v. Bd. of Educ. of Chic.*, 755 F.3d 605, 607 (7th Cir. 2014) (quoting *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010)).

### 1.     Dr. Rao's Alleged Constructive Discharge

Rao argues that he is entitled to summary judgment on his due process claim because all of his positions were cognizable property interests and that he was either constructively discharged or coerced into resigning.  Defendants argue that Drs. Azar and Rusch were not

---

[16] As noted above "[t]he same requirements for proving [national origin] discrimination apply to claims under Title VII and the Equal Protection Clause, so we consider them together." *Cole*, 838 F.3d at 899.

sufficiently involved to render them liable, only Dr. Rao's tenured position can be considered a property interest, and the individual defendants are nevertheless entitled to summary judgment because Rao voluntarily resigned.

### a. Property Interests

"A property interest in continued employment can be created in one of two ways, 1) by an independent source such as state law securing certain benefits; or 2) by a clearly implied promise of continued employment. Due-process claims in the context of public employment require an entitlement to continued employment; more specifically, the plaintiff must have a legitimate claim of entitlement not to lose a valuable governmental benefit except for cause." *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010) (internal quotations omitted). Tenured faculty members have a property interest in their tenured positions. *See Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998) ("It is undisputed that, as a tenured faculty member, he had a property interest in his job."); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.").

As Defendants concede, Rao's position as a tenured professor is a cognizable property interest for purposes of his due process claim. (Dkt. 257 at 2.) Rao goes on to argue, without support, that his three other appointed, non-tenured positions are also cognizable property interests. (Dkt. 228 at 3-4.) In support, he argues that his other positions required notice and hearing for suspensions and terminations and cites Section 12 of Illinois Statutes for "Academic Staff with Multi-Year Appoints" which, according to its title, governs dismissal of academic staff with *multi-year appointments*. (Pl. Ex. 0.) There is no dispute that the three non-tenured

positions were not multi-year appointments but were rather annual appointments, renewed on a yearly basis. (Def. SOF ¶¶ 7-9) Furthermore, Rao has failed to lay any foundation to conclude that his appointed positions were subject to any formal administrative process. Consequently, Rao fails to establish that any of those positions were governed by "a system of nondiscretionary rules governing revocation or renewal." *Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007) (quoting *Cornelius v. LaCroix*, 838 F.2d 207, 210 (7th Cir.1988)). Additionally, *Patterson v. Portch*, the one case he cites in support of his argument regarding property interests, says nothing about non-tenured positions. Instead, the case stands for a proposition not in dispute: Rao has a "property right in his tenured instructorship and he could not be deprived of it without due process of law." *Patterson v. Portch*, 853 F.2d 1399, 1405 (7th Cir. 1988).

### b. Constructive Discharge and Coerced Resignation

The crux of Rao's due process claim is whether he voluntarily resigned or whether he was constructively discharged or coerced into resigning. Generally, "[a] public employee who voluntarily resigns cannot complain about a lack of due process, but an "involuntary" resignation may in certain circumstances form the basis of a due-process claim." *Palka*, 623 F.3d at 452. "Two types of involuntary resignation may qualify—constructive discharge and coerced resignation. Constructive discharge occurs when an employer makes employment so unbearable that an employee resigns; coerced resignation is characterized by the presence of a Hobson's choice in which the employee must resign or suffer severe consequences, such as facing criminal charges." *Id.* at 453. Put another way, a finding of constructive discharge can be made when "'the handwriting [was] on the wall' and the axe was about to fall." *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d at 332. Although Dr. Rao argues that a jury could find that he was

constructively discharged under either form, the second form is the more appropriate avenue to evaluate his claims based on the facts of the case.[17]

Defendants argue that summary judgment is appropriate because Rao had the opportunity to retain his position and fight the termination proceedings against him, and that "the prospect of being fired at the conclusion of an extended process, without more, does not meet this standard [for constructive discharge]." *See, e.g., Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333-34 (7th Cir. 2004). *Cigan*, and the other cases like it cited by the Defendants, however, did not involve employer conduct that could "undermine the employee's position, perquisites, or dignity in the interim" and all involved employees who continued to receive pay pending an administrative hearing. *Id.* at 333. In *Cigan*, which involved employment claims by a disabled teacher, the teacher resigned after the school superintendent recommended that the district should not renew her contract. *Id.* at 332. There were no other actions undertaken in the interim to undermine her job functions and she continued to receive pay. *Id. See also Levenstein*, 414 F.3d at 775 (agreeing with district court, after it ruled at a bench trial, that tenured University professor, who resigned after being temporarily transferred with pay during administrative proceedings, was not constructively discharged); *Palka*, 623 F.3d at 452 (finding that there were not sufficient allegations of constructive discharge when employee who was suspended with pay resigned rather than face an internal investigation and potential loss of benefits); *Welter v. City of Elgin*, 2013 WL 1337347, at *5 fn. 6 (N.D. Ill. March 29, 2013) (same).

---

[17] To establish constructive discharge under the harassment theory, Rao would need to show that his "working conditions must be even more egregious than the high standard for hostile work environment claims, because, in the ordinary case, an employee is expected to remain employed while seeking redress." *Boumehdi v. Plastaq Holdings, LLC*, 489 F.3d 781, 789-790 (7th Cir. 2007). *See, e.g., Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (providing examples of the high bar of harassment that plaintiffs must fact to show constructive discharge based on harassment, including threats to personal safety. Rao has not made such a showing nor could he based on the facts of this case.

Unlike those cases, a reasonable jury could view certain facts that are undisputed to be facts demonstrating that the University undermined Rao's position, perquisites, and dignity to the extent that he was coerced into resigning. For example, shortly before the March 21, 2013 meeting, Plaintiff's access to University property and computer systems were restricted and his University-issued laptops and electronics were collected shortly thereafter by University personnel who accompanied him home. (Def. SOF ¶¶ 47-48; Pl. SOF ¶ 40.) Rao was not informed of how long these restrictions would last and the duration of the restriction is not reflected in Kaye Scholer's memo memorializing the meeting. Rao was also informed that the University was prepared to take action to relieve him of all of his titles and duties, the allegations against him would be made public, and in the meantime, he would not be permitted to work. (Pl. SOF ¶¶ 27, 36.) As a result of the restrictions, Rusch did not expect that Rao could perform the same level of work as he had done before. (Pl. SOF ¶¶ 25, 29, 42; Def. SOAF ¶ 4.) Constructive discharge has been found under similar circumstances. *See EEOC v. Univ. of Chic. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002) (finding that EEOC met burden in showing constructive discharge after University packed up her belongings, along with warning of "intent, plan, and attempt" to terminate her).

Additionally, in spite of the Defendants' assertions otherwise, there is disputed evidence in the record to support the conclusion that the University informed Rao that his pay would continue during the time he was pondering the offer to resign. In fact, Kaye Scholer's memo regarding the meeting does not address the issue. Rao was also told that the allegations against him would be made public if he did not resign and he was encouraged not to contact his employees. Rao testified that as a result of the meeting, he felt that he was being terminated. (Pl. SOF ¶ 72; Pl. SOAF ¶ 45.) At the meeting, the University's representatives did not ask Rao

any questions and Sussman told Rao and his attorney that he did not think anything that anything Rao or his attorney told him was going to make a difference. (Pl. SOF ¶¶ 34, 48.)

Furthermore, a "[c]ourt may consider an employer's exploitation of a particular employee's vulnerabilities" in determining whether he was constructively discharged. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 410 (7th Cir. 2008). The meeting was scheduled with little notice to Rao and Sussman was aware that Rao had some recent stress-induced health issues and that his father-in-law had recently passed away. (Pl. SOAF ¶ 24; Pl. SOF ¶ 23.) McNeely, who did not attend the meeting, was also aware that Dr. Rao had some recent weight loss and health concerns. (Pl. SOF ¶ 24.) Most significantly, the University knew that Rao was preparing to attend his father-in-law's funeral in India within two days of the meeting. (Pl. SOAF ¶ 24; Dkt. 262-3 ¶ 12.) Therefore, the meeting was conducted late on a Thursday afternoon, within 48 hours of Rao's planned travel to India for the funeral. (*Id.*) Rao was given until Monday at 9:00 a.m. to make a decision about whether to contest the evidence set forth in the PowerPoint or resign. A reasonable jury considering all of these facts might conclude that Rao was coerced to resign.

Of course, many facts weigh against a finding of coercion including and significantly that Rao was represented by counsel and had access to other family members who were lawyers who could advise him. Yet tellingly, Rao's attorney informed Sussman that Rao had made up his mind within hours of the meeting and after speaking with family members including his wife, presumably the daughter of the man whose funeral they were about to leave to attend within twenty-hour hours. Whether that familial advice or even the attorney's advice under those circumstances would constitute lack of coercion is less clear under the unique circumstances. It

is precisely this type of competing factual scenarios and how a juror might view them that requires a jury to make the determination.

For these reasons, neither side is entitled to summary judgment as to Dr. Rao's due process claim as it pertains to his alleged constructive discharge.

### c. Drs. Rusch and Azar's Personal Involvement

Rao's Section 1983 claims require him to demonstrate that Drs. Rusch and Azar were personally involved in the alleged constitutional deprivations. *See O'Shell v. Cline*, 571 F. App'x 487, 491 (7th Cir. 2014). *Hildebrandt*, 347 F.3d at 1039 ("For a defendant to be liable under § 1983, he or she must have participated directly in the constitutional violation.") To be liable, there must be some causal connection or affirmative link between the actions complained of and Drs. Rusch and Azar and the constitutional deprivations, meaning that they "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye...." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (quotation omitted).

Defendants argue that Rusch and Azar played no role in the decision restrict Rao's access to University property and computer systems. There is sufficient evidence, however, to create a triable issue as to whether Rusch and Azar were sufficiently involved in Rao's departure from the University to be personally liable. Rusch received the initial allegations against Rao, formed the Dean's Committee to investigate the allegations, guided the scope of its inquiry, and then forwarded the allegations to McNeely. (Def. SOF ¶¶ 16, 18-21.) After Azar became aware of the allegations, he recommended that Rusch forward her concerns to an appropriate body for further investigation. (Pl. SOAF 41.) On September 4, 2012, Rusch and Azar met with McNeely and others to define a plan of action regarding the allegations againstRao. (Dkt. 227-6 at 207:9-20.) Rusch was interviewed twice by Kaye Scholer as part of the investigation. In February 2013,

Rusch and Azar attended a Board meeting where Rao was discussed. (Pl. SOAF ¶ 43.) McNeely does not recall Rusch or Azar being present at the meeting where it was decided that Rao would be presented with the evidence of Kaye Scholer's investigation, although Rusch was aware that the meeting was going to take place and McNeely informed her that she hoped Rao would resign. (Dkt. 227-6 at 263:14-23; Dkt. 227-3 at 171:13-23.) Azar and Rusch also were part of conversations, with various updates, leading up to the decision to offer Rao the opportunity to resign. (Dkt. 227-6 at 14-23.) Rusch was also aware that Rao's access to his office and the University computer systems were being limited since her assistant made the arrangements. (Pl. SOAF ¶ 45; Pl. SOF ¶ 41.) As a result, Rusch did not expect that Rao could perform the same level of work as he had before. (Pl. SOAF ¶ 45.) Following the meeting, McNeely updated Rusch and informed her that the University was waiting for Rao's response. (Pl. SOAF ¶ 34.) Rusch testified that she did not think she should have been present at the March 21, 2013 meeting because she was not involved in the investigation. (Pl. SOAF ¶ 34.) Rusch met with Dr. Rao's department following Rao's resignation. (Pl. SOAF ¶ 34.)

These facts are sufficient to support the conclusion that Drs. Rusch and Azar were sufficiently involved to be held liable under Section 1983. In fact, a defendant who just "set[s] in motion" a series of events that he knew or should have known would cause others to deprive plaintiff of rights may be liable under § 1983." *Conner v. Reinhard*, 847 F.2d 384, 396–97 (7th Cir. 1988).

### 2.      Research Integrity Investigation

Drs. Rusch and Azar, however, are entitled to summary judgment on Dr. Rao's due process claims regarding the research integrity decision. Dr. Rao failed to respond to the Defendants' motion for summary judgment on this point and does not raise it whatsoever in his

own motion for partial summary judgment.  As a result, the argument is waived.  *See Bonte*, 624 F.3d at 466 ("Failure to respond to an argument . . . results in waiver.").

There is good reason for Rao to concede summary judgment on this point.  Rao has not presented sufficient evidence for a reasonable jury to conclude that Dr. Rusch or Dr. Azar were sufficiently involved in the research integrity decision.  Drs. Rusch and Azar referred the research integrity investigation to Dr. Grabiner who oversaw the pre-inquiry, inquiry, and investigation stages.  The Investigation Panel, however, concluded that it "could not reach the level of confidence as indicated by the term 'preponderance'" to find that Plaintiff was directly responsible for the issues with the papers under review, finding that he acted recklessly.  (Def. SOF ¶¶ 71, 74.)  After that point, Dr. Dutta, made the recommendation that Dr. Rao be held responsible for the research misconduct.  (Def. SOF ¶ 72.)  Plaintiff has failed to identify any evidence that either Drs. Rusch or Azar played any role in that determination or the subsequent decision by the University President to affirm Dr. Dutta's recommendation.

Second, Rao cannot show that the Research Integrity decision deprived him of a cognizable property interest.  As Rao recognizes, the only recognized property interest in regards to his employment at the University was his position as a tenured professor.  It is undisputed that this position terminated in March of 2013, long before Dr. Dutta came to her conclusion in the research integrity investigation.  As a result, Rao cannot show that he was deprived of a cognizable property interest as a result of the research integrity decision.

## <u>CONCLUSION</u>

For the foregoing reasons, Dr. Rao's motion for partial summary judgment is denied and the Defendants' Motion for Summary Judgment is granted as to Counts I, II, VII, VIII, and X but denied as to Count IX.

Dated:  June 5, 2017                                     Hon. Virginia M. Kendall